IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| AKILAH E. HATFIELD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACT. NO.  3:11CV53-MHT |
| | ) | (WO) |
| BIO-MEDICAL APPLICATIONS OF | ) | |
| ALABAMA, INC. d/b/a BMA OPELIKA, | ) | |
| a subsidiary of FRESENIUS MEDICAL | ) | |
| CARE HOLDINGS, INC. d/b/a | ) | |
| FRESENIUS MEDICAL CARE NORTH | ) | |
| AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE AND ORDER**

This is an employment discrimination case filed by Akilah E. Hatfield, *pro se*, against

her former employer, Bio-Medical Applications of Alabama, Inc. ("BMAA") d/b/a BMA

Opelika, a subsidiary of Fresenius Medical Care Holdings, Inc., d/b/s Fresenius Medical Care

North America.  Hatfield alleges that BMAA subjected her to discrimination and a hostile

work environment on the basis of race and gender and retaliated against her for complaining

about discriminatory practices in violation of Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000e, *et seq.*, as amended by the Civil Rights Act of 1991.  She also alleges that

BMAA defamed her in a written notice of termination and in a submission to the EEOC.

Now pending before the court is the motion for summary judgment (Doc.  49) filed

by BMAA.  Having reviewed the motion for summary judgment, together with the pleadings,

affidavits, depositions, answers to interrogatories, and admissions on file, the court concludes

that the motion for summary judgment is due to be granted.

Also pending is a motion for leave to file (Doc. 64) submitted by Hatfield. Having considered Hatfield's motion for leave to file, the court will grant the motion. In addition, BMAA has filed motions to strike several of Hatfield's summary judgment submissions as untimely, or, in the alternative, motions for leave to respond to Hatfield's submissions. (Docs. 62, 65, & 68). Having considered BMAA's motions to strike, the court concludes that these motions are due to be denied as moot.

## Standard of Review

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute[1]] as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (citation omitted); Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine

---

[1]Effective December 1, 2010, the language of Rule 56(a) was amended. The word "dispute" replaced the word "issue" to "better reflect [ ] the focus of a summary-judgment determination." Fed. R. Civ. P. 56(a), Advisory Committee Notes, 2010 Amendments.

[dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may meet this burden by presenting evidence which would be admissible at trial indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322–324.

Once the movant meets his evidentiary burden and demonstrates the absence of a genuine dispute of material fact, the burden shifts to the non-moving party to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to his case exists. *Celotex*, 477 U.S. at 324; *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see also* Fed. R. Civ. P. 56(c) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.").  A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor.  *Greenberg*, 498 F.3d at 1263.

To survive the movant's properly supported motion for summary judgment, a party is required to produce "sufficient [favorable] evidence" "that a reasonable jury could return

a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). "If the evidence [on which the nonmoving party relies] is merely colorable ... or is not significantly probative ... summary judgment may be granted." *Id.* at 249–250. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1576–1577 (11th Cir. 1990) (quoting *Anderson*, *supra*). Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine dispute of material fact and, therefore, do not suffice to oppose a motion for summary judgment. *Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001). Hence, when a nonmoving party fails to set forth specific facts supported by appropriate evidence sufficient to establish the existence of an element essential to its case and on which the nonmovant will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party. *Celotex*, 477 U.S. at 322 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

For summary judgment purposes, only disputes involving material facts are relevant. *United States v. 5800 SW 74th Ave.*, 363 F.3d 1099, 1101 (11th Cir. 2004). What is material is determined by the substantive law applicable to the case. *Anderson*, 477 U.S. at 248; *Lofton v. Sec'y of Dep't of Children & Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will

preclude entry of summary judgment."). "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted). To demonstrate a genuine dispute of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita Elec. Indus. Co, Ltd., v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In cases where the evidence before the court which is admissible on its face or which can be reduced to admissible form indicates that there is no genuine dispute of material fact and that the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper. *Celotex*, 477 U.S. at 323–324 (summary judgment appropriate where pleadings, evidentiary materials and affidavits before the court show there is no genuine dispute as to a requisite material fact); *Waddell*, 276 F.3d at 1279 (to establish a genuine dispute of material fact, the nonmoving party must produce evidence such that a reasonable trier of fact could return a verdict in his favor). However, if there is a conflict in the evidence, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255; *Ruiz de Molina v. Merritt & Furman Ins. Agency*, 207 F.3d 1351, 1356 (11th Cir. 2000).

Although factual inferences must be viewed in a light most favorable to the

5

nonmoving party and *pro se* complaints are entitled to liberal interpretation by the courts, a *pro se* litigant does not escape the burden of establishing by sufficient evidence a genuine issue of material fact. *Beard v. Banks*, 548 U .S. 521, 529 (2006); *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990). Thus, the plaintiff's *pro se* status alone does not mandate this court's disregard of elementary principles of production and proof in a civil case.

### Facts[2]

BMAA operates a clinic in Opelika, Alabama, where it provides hemodialysis to kidney patients. (Doc. 51-5 ¶¶ 1, 3). The hemodialysis process involves drawing blood from the patient to be filtered by the dialysis machine. (Doc. 51-5 ¶ 3). The dialysis machine filters harmful wastes, salt, and excess fluid from the patient's blood, essentially fulfilling important functions normally carried out by the kidneys. (Doc. 51-5 ¶ 3).

The hemodialysis process generally lasts three to four hours. (Doc. 51-5 ¶ 4). At the clinic, the first round of dialysis patients is scheduled to begin treatment at 6:00 a.m. in the morning, which means that the patients from the first round usually finish treatment around 10:00 a.m. (Doc. 51-5 ¶ 4; Doc. 51-9 ¶ 6; Doc. 51-1 p. 19). At that time, a second round of

---

[2]At this stage of the proceedings, this court takes the facts alleged by the non-movant as true and construes them in the light most favorable to the non-moving party. *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000) (citations omitted) ("In assessing whether there is any 'genuine issue' for trial, the court 'must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party' and 'resolve all reasonable doubts about the facts in favor of the nonmovant.' Moreover, the court must avoid weighing conflicting evidence or making credibility determinations. Instead, '[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.'"). Thus, the facts set forth herein are drafted relying on the undisputed facts and construing the facts in the light most favorable to the non-moving party.

patients are scheduled to replace the departing first-round patients.  (Doc. 51-5 ¶ 4; Doc. 51-9 ¶ 6).

Dierdre Joseph, an African-American female, is the clinic manager for BMAA's Opelika clinic.  (Doc. 51-5 ¶ 1).  Joseph reports to Deb Morris, a white female who is BMAA's area manager and who oversees six of BMAA's clinics, including the one in Opelika.  (Doc. 51-5 ¶ 1; Doc. 51-8 ¶ 1).  Morris's office is located at the Opelika clinic. (Doc. 51-8 ¶ 1).  The Opelika clinic is generally staffed with the Area Manager (Deb Morris), the Clinic Manager (Joseph) and two Registered Nurses ("RNs") who serve as Team Leaders and each take responsibility for half of the dialysis stations.  (Doc. 51-5 ¶ 5;  Doc. 51-9 ¶ 5; Doc. 51-1 pp. 16-17).  The RNs usually supervise two or more Patient Care Technicians ("PCTs") who monitor the patients.  (Doc. 51-5 ¶ 5).

Since 2004, Hatfield has been certified as an RN.  (Doc. 51-1 pp. 11, 13).  She has worked as an RN since she received her nursing certification in 2004.  (Doc. 51-1 pp. 11, 13). On May 12, 2008, Joseph and Morris hired Hatfield to work for BMAA as an RN/Team Leader in its Opelika dialysis clinic.  (Doc. 51-5 ¶ 6; *see also* Doc. 1-1 p. 2).  As an RN/Team Leader, Hatfield was responsible for supervising approximately ten patient dialysis stations and the PCTs who treated patients at those stations.  (Doc. 51-1 p. 16; Doc. 51-5 ¶ 6).  Joseph supervised Hatfield until the summer of 2009, when Eric Dowdell, an African-American male RN, was promoted to Charge Nurse from a position as RN/Team Leader.  (Doc. 51-5 ¶ 15; Doc. 51-9 ¶¶ 1- 2).  Hatfield and Dowdell were both RN/Team Leaders until Dowdell

was promoted to Charge Nurse.  (Doc. 51-9 ¶ 5).  Thereafter, Dowdell was Hatfield's supervisor.  (Doc. 51-5 ¶ 15; Doc. 51-9 ¶¶ 1- 2, 5).

Upon hiring, Hatfield entered an eight-week orientation and training period in which she was scheduled to arrive at work 8:00 a.m. on certain days to attend class, and to arrive at work at 5:45 a.m. on other days for clinical training sessions.  (Doc. 51-5 ¶ 12; *see* Doc. 1-2 p. 1).  The training included classroom instruction by Education Coordinator Joy Henderson, PCT training by PCT Debbie Glaze, and RN training by Eric Dowdell. (Doc. 51-5 ¶ 12-13).

During the time that Hatfield trained with PCT Glaze, she had to arrive to work at the scheduled start time for the PCTs, which included some start times of 5:00 a.m. (Doc. 51-1 p. 51; Doc. 51-5 ¶ 13).  Hatfield, however, never had to report to work prior to 5:00 a.m. (Doc. 51-5 ¶ 13).  The next RN to be trained to be a Team Leader was Travis Leprettre,[3] a white male RN who began training in May of 2009.   (Doc. 51-5 ¶ 13; Doc. 51-6 pp. 63-67). Because of changes that had been made to the PCT schedule, Leprette had to arrive earlier than Hatfield did to train with the PCTs, frequently before 5:00 a.m. and sometimes as early as 4:30 a.m.  (Doc. 51-5 ¶ 13; Doc. 51-6 pp. 63-67).

Eric Dowdell stated in a sworn affidavit that, when he served as Hatfield's trainer, he "trained her regarding the responsibilities of the [RN/Team Leader]. As part of her training, [he] told her that she is to follow doctor's prescriptions when administering hemodialysis to

_____

[3]Leprettetre's last name is spelled different ways throughout the record in this case.  (See, e.g., Doc. 51-5 ¶ 13 & Doc. 51-6 p. 64 ( "Leprettre"); Doc. 51-7 p. 32 ("Lerettre")).

patients." (Doc. 51-9 ¶ 4). In addition, Hatfield acknowledged in her deposition testimony that "at some point" she reviewed BMAA's policy on physician order documentation, which specified that "it is the nurse's responsibility to [e]nsure that all treatments, medications, labs, or any other care provided by the patient have . . . an accurately documented physician order" and that "Nurse Practice Acts require nurses to carry out treatment care, medication, administration, lab tests, et cetera, based on physician orders." (Doc. 51-1 p. 33).

During the training, Hatfield reported to Joseph that Team Leader Hermine Dodge did not properly administer sodium dialysis to patients. (Doc. 51-5 ¶ 14). Dodge, an RN who has worked at the Opelika Clinic for many years, was administering sodium dialysis to patients in accordance with one of BMAA's older procedures instead of a newly revised procedure. (Doc. 51-5 ¶ 14). Shortly after hearing that Dodge was using the old procedure, Joseph counseled Dodge that she should administer sodium dialysis to patients per the newly revised procedure. (Doc. 51-5 ¶ 14). To Joseph's knowledge, Dodge has not used the old procedure again. (Doc. 51-5 ¶ 14). Hatfield alleges that Dodge continued to use the old procedure; however, Hatfield never again reported to anyone that Dodge was continuing to use the old procedure. (Doc. 51-1 p. 47).

According to Hatfield, Dodge was also sometimes tardy returning from lunch breaks and was allegedly never disciplined for these tardies. (Doc. 51-1 p. 48). Hatfield testified at her deposition that she personally "felt hardship, I mean, unjust hardship and things of that nature" because Dodge's lunch breaks sometimes lasted forty or forty-five minutes instead

of the allotted thirty minutes, and "nobody sa[id] anything about it."  (Doc. 51-1 p. 48).

However, Hatfield also admitted that "maybe" she "might have" also taken lunch breaks that

lasted longer than thirty minutes at times, and she was never disciplined for the length of her

breaks, either.  (Doc. 51-2 p. 8).  In fact, although Hatfield alleges that she and Dodge were

not the only ones who overstayed their lunch breaks, she was not aware of "anybody" who

has ever been disciplined for doing so.  (Doc. 51-2 p. 8).

   After training, Hatfield began work as a Team Leader.  (Doc. 51-5 ¶ 15).  Hatfield's

start time for work as a Team Leader was usually 5:45 a.m. (Doc. 51-5 ¶ 16).  Patients

usually began appearing at the clinic around 6:00a.m. and then were prepared for dialysis

treatment.  (Doc. 51-5 ¶ 16).  Prior to starting dialysis treatment on a patient, Hatfield, as the

RN, was responsible for reviewing doctor's orders and checking the dialysis machines to

ensure everything was programmed correctly and that the machine alarms were functioning

properly.  (Doc. 51-5 ¶ 17).  The doctor's order indicated how long the patient should receive

dialysis treatment and what the patient's estimated dry weight should be after dialysis. (Doc.

51-1 pp. 22, 31; Doc. 51-5 ¶ 18).  The patient's dry weight was a function of how much

weight the patient was expected to lose as a result of excess fluids being removed from the

patient's blood during the dialysis procedure.  (Doc. 51-1 p. 31).  The doctor's prescription

also indicated the rate of the dialysis filtering and the blood flow rate, which determined how

fast the patient's blood was pulled from his body and cycled through the dialysis machine.

(Doc. 51-5 ¶ 18; Doc. 51-1 pp. 31-32).

Hatfield provided the following testimony during her deposition in this case with respect to her duties as RN/Team Leader:

Q: When you -- after you assessed a patient's needs, did you develop any type of program for treating that patient?

Hatfield: I didn't develop anything.  You have to follow the physician's orders.

Q: Okay. So, as a registered nurse, it's not your job to develop the treatment plan for the patients, right?

Hatfield: I don't develop treatment plans.

Q: That's actually what the physicians do, correct?

Hatfield: I would assume.

Q: Okay. Your job is to follow the doctor's orders?

Hatfield: Follow the doctor's orders.

Q: Okay. Whatever the doctor orders the patient to be given or how the patient is to be treated, you have to follow those doctor's orders, right?

Hatfield: I do, yes, I have to follow those orders as far as I -- yes. With --now, just clarify that a little bit more when you say as far as -- because the patients do have a say-so in what goes on in their treatment as well as in addition to us -- do you get what I'm saying?

Q: No, I'm not understanding you.

Hatfield: The physician[s] have orders, but the patient does have rights. I have to follow the physician orders, but I also have to adhere to the rights of my patients as well, that's what I'm saying.

Q: Okay. What type of rights are you talking about?

. . . .

11

Hatfield: Whatever their request -- some of their requests, I mean, in relation to their treatment.

Q: Are you saying that you can override a doctor's or a physician's order?

Hatfield: I did not say that. I did not say that.

. . . .

Q: [T]he question was, as a registered nurse working at [BMAA], were you required to follow the physicians' orders?

Hatfield: Yes, I am required to follow the physicians' orders.

Q: Did you also monitor and supervise patient care technicians in doing their jobs?

Hatfield: Yes, that's a part of it. Yes.

Q: And did you make sure that they followed proper policies and procedures?

Hatfield: To the best of my ability.

Q: As a registered nurse working for [BMAA], were you responsible for accurately implementing the treatment prescription that was prescribed by the doctor?

Hatfield: It's my responsibility as far as I know, yes.

(Doc. 51-1 pp. 15-16).

Hatfield also provided the following testimony:

Q: If you don't follow a physician's orders, somebody could get hurt-- I mean, but if you don't follow the physician's orders, then a patient could suffer some type of medical problem as a result of that, right?

Hatfield: I mean, the only thing I can tell you is I followed the orders.

Q: I guess you are required by law to follow the orders?

Hatfield: Yes.

Q: You are required by company procedures to follow the physician's orders?

Hatfield: Yes.

Q: My question was: If you don't follow the physician's orders, then you are taking a risk that something could happen to the patient?

Hatfield: That is a risk.

(Doc. 51-1 p. 32).

As RN/Team Leader, Hatfield also was responsible for administering an anticoagulant called Heparin, if required by the physician's prescription, prior to starting dialysis. (Doc. 51-5 ¶ 19). Heparin prevents blood clotting and facilitates blood flow during the dialysis process. (Doc. 51-5 ¶ 19; Doc. 51-1 p. 19). Once an RN/Team Leader "signed off" on the computer, indicating that she had finished her initial checks, assessments, and administration of Heparin (if required), dialysis on the patient could begin. (Doc. 51-5 ¶ 20). A PCT cannot administer Heparin; Heparin must be administered by an RN. (Doc. 51-1 p. 19). Before administering Heparin, the RN/Team Leader would have to review the doctor's orders, check the dialysis machine for proper setup and functioning, verify that alarms on the machine were operable, and assess the patient by checking the access site for drawing blood from the patient, "looking at [the patient], . . . talking to them, . . . finding out how they're doing, getting background as far as just how they made out from their last treatment and how they're feeling that morning. You do a physical assessment. . . . Physical assessment involved listening to heart, lungs, anterior and posterior." (Doc. 51-1 p. 21). After the administration

13

of Heparin and before beginning dialysis, a wait time of approximately five minutes was required for Heparin to take effect. (Doc. 51-1 pp. 22-23; Doc. 51-5 ¶ 19).

On April 15, 2008, Hatfield was provided with BMAA's employee handbook, which stated, in relevant part:

> Attendance and Punctuality
> The efficient operation of our company depends upon each of us fulfilling our share of responsibility. When you are not at work, productivity is interrupted and patient care and business operations may be affected

(Doc. 1-3 pp. 6, 11; Doc. 51-5 ¶ 7)

However, as early as her orientation training, Hatfield began to arrive late to work. (Doc. 51-5 ¶ 22; Doc. 51-1 p. 29). Hatfield admits that she "had tardiness problems" during training and that her trainer noted that her tardiness was an area in which improvement would be necessary. (Doc. 51-1 p. 29). Both patients and staff were inconvenienced when Team Leaders came to work late. (Doc. 51-9 ¶ 12). It was important to BMAA that Hatfield report to work in a timely manner because the PCTs who reported to Hatfield could not begin to dialyze patients before Hatfield performed machine checks, assessed the patients, administered Heparin, and approved the start of the dialysis process. (Doc. 51-5 ¶ 21). BMAA's goal was for the Team Leaders to have the first patient on the dialysis machine by 6:00 a.m. (Doc. 51-9 ¶ 12). Although Hatfield was usually scheduled to start work around 5:45 a.m., she would often report to work well after 6:00 a.m. (Doc. 51-1 p. 16; Doc. 51-9 ¶ 11). She generally reported to work tardy at least once a week, and sometimes more often than that. (Doc. 51-9 ¶ 11). She gave reasons for being late, such as oversleeping, a

14

"transportation issue," or a family member being sick.   (Doc. 51-9 ¶ 11).  When Eric Dowdell was a Team Leader, if Hatfield came in late, he could only put a limited number of patients on dialysis until Hatfield arrived at work. (Doc. 51-9 ¶ 12).  When Dowdell was promoted to was Charge Nurse, if Hatfield came in late, he would have to assume her responsibilities until she came to work.  (Doc. 51-9 ¶ 12).

Hatfield gave the following testimony at her deposition in this case:

Q: [I]t does create a burden on other employees when someone doesn't get there on time, doesn't it?

Hatfield: I would assume so, I'm usually the one late, so, I guess.

Q: I mean, if you are not there, they can't start the dialysis of the patients, right?

Hatfield: Yes, according to my assignment, yes.

Q: For the patients to which you are assigned –

Hatfield: Yes.

Q: – the PCTs can't start the dialysis before you get there?

Hatfield: No.

Q: They can't administer the Heparin?

Hatfield: No.

Q: So, everybody is waiting on you if you're late?

Hatfield: Correct.

Q: Including the patients?

15

Hatfield: Correct.

(Doc. 51-1 pp. 57-58).

On June 18, 2008, Hatfield received written discipline for tardiness.  (Doc. 1-4 p. 2).

The disciplinary notice, which was signed by Joseph, stated:

Nature of Incident:
Since hire date 05/13/08, Akilah has missed three days of work and has been chronically late/tardy. The procedure for reporting an absence was reviewed with Akilah per the Education coordinator; however, on Friday, June 13, 2008 Akil[]ah failed to follow the policy.

Describe Expectation for change:
Akilah is expected to be present for all shifts as scheduled and on time. Akilah is expected to follow policies and procedures at all times. Akilah needs to understand that it takes all staff to be present in order for this unit to function properly. Akilah is very early in her training and being late and or absent prolongs this process as well as creating undo[sic] hardship for fellow co-workers while creating a hostile work environment. In order for Akil[l]ah to maintain her position with this facility, immediate improvement must be noted. Akilah is being provided with a copy of the attendance policy as well as a list of staff phone numbers.

Consequences if No Change Occurs:
Failure to meet expectations for change described above or failure to demonstrate satisfactory performance, will result in further corrective action, which may include termination of your employment.

(Doc. 1-4 p. 2).[4]

Hatfield alleges that, at a meeting regarding her June 2008 written disciplinary action, she was told that because she was the "new kid on the block," everyone was watching her

---

[4]In her deposition, Hatfield acknowledged that the June 2008 warning was correct in indicating that she had problems arriving at work on time.  (Doc. 51-1 pp. 36-37).  She did not remember whether she had also missed three days of work "for no reason."  (Doc. 51-1 p. 37).

and she "could not get away with the actions of [her] fellow co-workers." (*See* Doc. 1-2 p. 2; Doc. 1-7 p. 7).  Hatfield was provided with a written copy of BMAA's tardiness and attendance policy, which stated, in relevant part:

> TARDINESS:
> All employees are expected to be at their assigned work location at the start of their shift. Therefore, employees who are not at their work station at the scheduled start time of their shift will be considered tardy.
>
> CALL IN PROCEDURE:
> Employees who are absent or tardy are required to notify their supervisor, or Location Manager, prior to the start of their scheduled shift. Employees are expected to give as much notice as possible, with at least one hour of notice before the start of their shift. This will help insure that arrangements for coverage can be made.
>
> . . . .
>
> GENERAL PROVISIONS:
> The following guidelines define the standards for attendance and tardiness. The time frame used to record unscheduled absences and tardiness will be for a 12 month period. This time period will be measured from the current date back to the previous 12 months, excluding approved Leaves of Absence or occurrences due to a serious health condition covered by the FMLA.
>
> Trends and patterns should be noted, for example, an employee who frequently calls in sick on Mondays, Fridays, before or after a holiday. Also, an employee who has many occurrences of unscheduled absences or tardiness within a short time frame [sic].  These types of issues may result in corrective action before the standard guideline of 7 occurrences or greater which is outlined below.
>
> Occurrences of absenteeism and tardiness will be added together to determine the need for corrective action and will have a negative result on the performance evaluation.
>
> Occurrences Standard
> 0 - 1 absence/tardiness = Excellent
> 2 - 3 absences/tardiness = Good

4 - 5 absences/tardiness = Satisfactory

6 - 7 absences/tardiness = Needs Improvement

Greater than 7 absences/tardiness is unsatisfactory.

. . . .

PROCEDURE:

An employee who has reached the "Needs Improvement" level of absenteeism or tardiness will be subject to the corrective action process. Management discretion for extenuating circumstances will be allowed in the decision making process to determine appropriate disciplinary action.

Depending on the nature and severity of the infraction, steps in the corrective action process may occur. Corrective action for absenteeism/tardiness should be combined with the corrective action process for the same or other policy infractions (see Corrective Action Policy 111-1 ).

RESPONSIBILITY:

Supervisors should discuss verbal and written warnings with the Location Manager prior to discussion with the employee.

Disciplinary suspensions should be discussed and approved by the Regional Manager/General Manager, except when an incident is being investigated and the suspension is an immediate Investigatory Suspension.

All matters relating to the potential discharge of any employee should be reviewed with the Regional V.P[.]/Regional anager/Regional Director. Prior to a discharge, the Field Services Human Resources Department should be notified.

Staff members of the Field Services Human Resources Department are available to advise and assist supervisors in the process of corrective action issues.

(*See* Doc. 1-2 pp. 3-5).

In June and July, 2008, Hatfield's timeliness improved. (Doc. 51-5 ¶ 23). On August

14, 2008, Joseph wrote in Hatfield's ninety-day Performance Review: "Akilah struggled with

timeliness initially and has improved tremendously.  It is expected that organizational skills will also improve [with] time."[5]   (Doc. 51-5 ¶ 23; Doc. 51-11 p. 1).  However, in August 2008, Hatfield again began to struggle with tardiness.   (Doc. 51-5 ¶ 24).  From August 18, 2008, until May 29, 2009, Hatfield was late to work 120 times.  (Doc. 51-5 ¶ 24).  In her complaint, Hatfield acknowledges that, from June 2008 until May 2009, she "continued to be tardy and had a period of excessiveness" in reporting late to work.  (Doc. 1-2 p. 6).

In August 2008, an internal audit was conducted at the clinic.  (Doc. 51-5 ¶ 30; Doc. 1-2 pp. 36-38).   Hatfield, along with other employees who were working during the audit, received discipline after the audit revealed that they were not following certain policies and procedures.  (Doc. 51-5 ¶ 30; Doc. 51-1 pp. 37-38).  On September 5, 5008, Hatfield was given a "verbal" warning with the following written documentation:

> Nature of Incident:
> Upon findings of an internal audit performed on 08/27/08, it was determined that staff was not following policy and procedure with: hand washing, documentation, following [patient] prescriptions, addressing machine alarms in a timely manner.   Also, it was found[] that clean supplies were in contaminated areas.
>
> Describe Expectation for change:
> It is expected that all staff follow all policy and procedures at all times. Immediate improvement is mandated. Failure to do so will result in further disciplinary action.
>
> Consequences if No Change Occurs:
> Failure to meet expectations for change described above or failure to

---

[5]In her deposition testimony, Hatfield acknowledged that the ninety-day performance review was correct in indicating that she had problems arriving at work on time, and that, at the time of the review, she had already been warned about her tardiness.  (Doc. 51-1 p. 36).

demonstrate satisfactory performance, will result in further corrective action, which may include termination of your employment.

(Doc. 51-4 p. 3) (sic).

On September 5, 2008, Hermine Dodge was given a "written" disciplinary citation for violations found in the August 27, 2008 internal audit.  (Doc. 53-1 p. 49).  The text of Dodge's citation was identical to the text of Hatfield's September 5, 2008  "verbal" citation for the same audit violations.  (Doc. 53-1 p. 49;  Doc. 51-4 p. 3).  Both Hatfield's and Dodge's citations stated that "THIS WARNING WILL REMAIN IN EFFECT FOR ONE YEAR.  IF THERE HAVE BEEN NO FUTURE INFRACTIONS OR VIOLATIONS OF COMPANY POLICY DURING THE ONE YEAR PERIOD, THIS WARNING WILL BE INVALID FOR THE PURPOSE OF THIS PROCEDURE BUT WILL REMAIN IN THE EMPLOYEE'S FILE."  (Doc. 53-1 p. 49;  Doc. 51-4 p. 3).

On October 17, 2008, Joseph and Morris submitted an email order for name badges for Akilah Hatfield and 5 other employees (RNs Isabel Rowe and Shirley Yountz, and PCT's Everlyn Davis, Brenda Levett, and Aretha Pugh).  (R. 53-1 pp. 18, 32-33, 46-48).  In her summary judgment response, Hatfield alleges that she never received a name badge even though she twice asked Joseph for one.  (Doc. 53 p. 4).  Deirdre Joseph and Deb Morris do not recall Plaintiff bringing it to their attention that she did not have a name badge.  (Doc. 53-1 pp. 32-33).

In March 2009, Hatfield requested that she not be scheduled to work on May 30, 2009, so that she could attend an academic recognition ceremony for her daughter.  (*See* Doc.

20

1-2 p. 9).  In her deposition Hatfield testified as follows with respect to her request for time

off in May 2009 and her return to a habit of tardiness:

> Q: Why did you start having trouble with tardiness again in 2009?

> Hatfield: Well, I had a lot going on at the time, I had a nephew that was about to graduate.  I had a daughter that was involved in a lot of academic stuff.  And I know around that time, I had asked – I had requested– my daughter had received . . . high marks for her SAT scores, and it was a big to-do behind that in our family because of her academic achievement.  And I had put in a request like that March, and I never received permission to be off on such a big event.  And I just had a lot of stuff going on in addition, you know, to my job with my family.

> Q: What other type of things?

> Hatfield: Just day to day, I had – at the time, my four-year-old was a lot younger at that time, I had a seven-year-old, I had one that was in kindergarten or in school or approaching school or doing something at that point, so I just had a lot of stuff, you know, just going on with my family outside of work.

> Q: You obviously understand, I mean, other people have families as well, right?

> Hatfield: Yes, I do.

> Q: And it's important to those patients that you be there timely, right?

> Hatfield: Correct.

> Q: Those patients who are there for dialysis treatment come and they're scheduled as to when they're supposed to start, right?

> Hatfield: Correct.

> Q: And most of them want to get out of there as soon as they can; isn't that right?

> Hatfield: I would assume so.

21

Q: I mean, it's not fun sitting in the chair –

Hatfield: I would assume so, yes.

Q: So I would think most of them would want to be started on time, right?

Hatfield: Yes.

Q: And finish on time, right?

Hatfield: Yes.

(Doc. 51-1 pp. 39-40).

In response to Hatfield's request to take the day of May 30, 2009 off from work, Joseph told her that she needed to find someone to work in her place on May 30 so that she could take the day off.  (Doc. 51-1 p. 42; *see* Doc. 1-2 p. 9).  Hatfield was unable to find someone to work her shift on May 30, 2009.  (Doc. 51-1 p. 42; *see* Doc. 1-2 p. 9).  By early or mid-May, 2009, Hatfield still remained on the schedule for May 30, 2009.  (*See* Doc. 1-2 p. 9).  Therefore, she approached Morris to request that she be allowed to take the day of May 30 off from work to be with her family.  (Doc. 51-1 p. 42; *see* Doc. 1-2 p. 9).  Hatfield alleges that Morris informed her that she would be allowed to take the day off, even if Joseph had to work Hatfield's shift for her.  (*See* Doc. 1-2 p. 9).  Subsequently, sometime between May 18 and 26, 2009, Joseph informed Hatfield that she had found someone to take Hatfield's shift on May 30, 2009.  (*See* Doc. 1-2 p. 9).

On May 29, 2009, Joseph provided Hatfield with a written disciplinary corrective action form which purported to be her "final written" warning for tardiness.  (Doc. 1-2 p. 14;

Doc. 51-1 p. 39).  The written warning stated:

> Nature of Incident:
> Akilah received disciplinary action in June 2008 for tardiness and the situation actually improved for a while; however, over the past few months the situation has become excessive. Akilah needs to understand that it is imperative that as a team leader, she present to work on time as scheduled. She also needs to understand that her actions create undo [sic] hardship on her peers, creates a hostile work environment, and is not fair to the patients.  Due to the severity of the situation and previous counseling for the same offense, Akilah is being given a final written warning.
>
> Describe Expectation for Change:
> Akilah is expected to improve her timeliness/tardiness immediately and is expected to continue for the length of her employment with FMC Opelika.
>
> Consequences if No Change Occurs:
> Failure to meet expectations for change described above or failure to demonstrate satisfactory performance, will result in further corrective action, which may include termination of your employment.

(Doc. 1-2 p. 14).

Hatfield understood that, as the time of her May 29, 2009 written warning, she was "in serious disciplinary trouble for attendance."  (Doc. 51-1 p. 39).   At her deposition, she testified as follows with respect to the May 29, 2009 disciplinary action:

> Q: Were you upset at that point in time?
>
> Hatfield: Probably to say the least, yes, I was upset.
>
> Q: And mad?
>
> Hatfield: I don't want to say mad, but I was upset about how I was being treated.
>
> Q: What did you think was unfair about the treatment?

23

Hatfield: As far as what?

Q: Well, you had been provided an attendance policy, right?

Hatfield: Uh-huh.

Q: Is that a yes?

Hatfield: Yes. I'm sorry.

Q: You understood the attendance policy, right?

Hatfield: Yes.

Q: You understood that being tardy would result in a disciplinary action?

Hatfield:  Yes.

Q: And you had a lot of tardies, right?

Hatfield: Yes.

Q: And you understood that you exceeded the number of tardies you could have before you were disciplined?

Hatfield:  I presume.

Q: You had even been given phone numbers to call staff if you're going to be late, right?

Hatfield: I was given a roster, yes.

Q: With phone numbers to call people?

Hatfield:  Uh-huh.

Q: Yes?

Hatfield:  Yes.

24

Q: And yet you say you were upset, is it because of what happened on May the 30th?

Hatfield: What happened on May the 30th, I was not at work May the-- I mean, I wasn't at work on May the 30th. It's like I said, I had asked for-- I had requested off for May 30th back in March, and like I say, I never received it, and like I say, I had to take other steps to try to have that day off, and a very important day for my family.

     . . . .

Q: It was your understanding, though, that Ms. Joseph told you that you had to find somebody to cover you in order to get off the schedule for the 30th?

Hatfield: I understood that, and I complied with that trying to find somebody to cover me.

Q: And you could not find anybody to cover you?

Hatfield: No one was -- everybody refused me. And the same person who worked for me that day, I asked them, they refused.

. . . .

Q: So, Ms. Joseph said you couldn't take off that Saturday unless you got somebody to replace you, right?

Hatfield: That's what I was told, yes.

. . . .

Q: And what did Ms. Morris say when you went to see her?

Hatfield: She told me not to worry about being off, that I could have that off and she understood, because I also . . . showed her documentation as far as my daughter was being honored by the mayor as well, at city council as well, so all of that stuff was leading up to the 30th, so when I went to her and showed her all of this stuff and the invitation, she told me not to worry about it and to enjoy that day. . . .

Q: Did you appreciate that?

Hatfield: At that time, I did, but it came with – I felt as thought it came with a write-up.

. . . .

Q: Explain to me what that [May 29 disciplinary write-up] had to do with the incident on May the 30th?  . . .  It doesn't have anything to do with what happened on the 30th, does it?

Hatfield: I believe it does. I believe all of it stems -- it's continuous, I don't believe that it's just an isolated incident of me being written up for my attendance. I have been -- if you go back and look, I've been being tardy for months if that was the case, but for it to be chosen on that day, the day before --the day before that all of those write-ups would have been dissolved and I would have been starting over or starting anew and I was written up prior to that, that kept the write-ups going, I just think it was retaliation.

Q: Retaliation for what?

Hatfield: For going over the clinical manager's head and requesting the day off when I had already been told by the clinical manager that I needed to find a person, and when I told the clinical manager that I couldn't find anybody, I was never told anything outside of that. That was just the end of it. So, I felt like my request was not being addressed either-- you know, it was not being totally addressed, especially after I stated I looked for someone to cover me.

Everybody -- I was not able to find anybody, no one said that they would work for me, and then after that, I never got another response back, it was just crickets, so I felt that I needed to go to the next person to ask for this day off because, as I said, it was an important event in my family's life.

Q: So, you think that . . .this final written warning was issued in part in retaliation because you went to Ms. Morris above Ms. Joseph to ask about getting off on the 30th?

Hatfield: I believe it had something to do with it. Yes, I'm not saying that that whole write-up is pertaining to that one incident, but I do believe it's a contributing factor.

Q: Okay. That you had gone to Ms. Morris over Ms. Joseph?

Hatfield: I do believe that.

(Doc. 51-1 p. 45).

Following her May 29, 2009 written disciplinary meeting with Joseph, Hatfield wrote

two letters. The first of these two letters, which she provided to her supervisors, stated:

5-29-09

To whom it may concern.

I am writing in regard to the final written disciplinary action that I received on May 29. I take full responsibility and accountability for my tardiness, I know that it is a weakness. I do understand that rules/policy/mandates are in place for respectable reasons. So, I do understand how my tardiness may and can be looked upon as a form of disrespect.

My tardiness is not an embarrassment to me, but only a reflection that I have not mastered the art of timeliness.

I do not wish or desire to advance to any position in this company. My God given assignment is to administer dialysis through Team Leader/Direct Patient Care only. My prayer and desire is to administer . . . my nursing skills with safety, within company policy and compassion. Due to the fact that I have agreed to improving my timeliness immediately, and expected to continue for the length of my employment at [BMAA].

I am requesting an immediate change in my work schedule to 7-close M-W-F and every other [S]aturday. My family life in the coming months will become more active and involved due to the fact of one of my children starting school and another one will be finishing this school term.

Due to the fact that tardiness/timeliness is an apparent weakness, if I continue this apparent disruptive behavior, I will for[e]go the embarrassment and humiliation of suspension and or termination and will resign immediately upon request.

Thank you,

A. Hatfield, RN

(Doc. 1-2 pp. 23-25) (sic).

In her letter, Hatfield requested an "immediate" schedule change because she hoped that she would not be tardy as often if she was allowed to start work later.  (Doc. 51-1 p. 57). However, by May 2009, Joseph already was allowing Hatfield to come in for a later shift at least once a week, and she felt it would be unfair to the other Team Leaders if she further adjusted Hatfield's schedule. (Doc. 51-5 ¶ 27).   Joseph also noted that Hatfield was frequently late for her later shift time as well.  (Doc. 51-5 ¶ 27).  Therefore, Joseph did not further change Hatfield's schedule as Hatfield requested in her letter.  (Doc. 51-5 ¶ 27).

Hatfield also wrote a second letter following her May 29 written disciplinary action. She made copies of this letter and left them at the nurse's station for her coworkers to find and read.  (Doc. 51-1 pp. 41-42).  The letter stated:

5/29/09

To all of my co-workers,

I am writing to apologize for my tardiness and for what ever hardship, hostile environment, grief, and disgust that I have caused.

I do feel that I give 100% of myself at [BMAA] to my patients and co-workers, but I over compensate for my tardiness.  I do think that as a person I am not wanted here in this "Family," so I do request that I am considered the "Black Sheep of the Family" until my assignment is over from God.  I want to thank everyone for any contribution to my experience at [BMAA].

I am not perfect nor claim to be, so I will say my good-bye now, because I may

28

be late again.  My tardiness is not an embarrassment to me or my family, but only a reflection that I have not mastered the art of timeliness.  But everything in my life is covered under the blood of Jesus Christ, my personal Lord and Savior.

Thank you,

A. Hatfield, RN.

(Doc. 1-2, pp. 21-22) (sic).

Hatfield did not work on May 30, 2009, but she was unable to enjoy her family's celebration of her daughter's academic achievement because she felt embarrassed and humiliated by the May 29, 2009 written disciplinary action.  (*See* Doc. 1-2 pp. 9, 17).

On June 2, 2009, Morris and Joseph met with Hatfield to discuss the letters she had written and to advise her that they deemed the letters to be inappropriate and unprofessional. (Doc. 51-5 ¶ 28; Doc. 51-8 ¶ 5).  After the meeting, Joseph wrote the following memorandum for her files:

June 2, 2009

MEMO:

D. Joseph, CM, and D. Morris. AM met with A. Hatfield to discuss the attached letters as well as her intent. Akilah was informed that her actions were inappropriate and unprofessional. Akilah explained that her intent was to apologize to her co-workers for the [e]ffect her tardiness may have had on them. She expressed remorse and sincerity. Akilah stated that she loved her job and working with the patients and had no desire to leave her position.  It was further explained to Akilah that despite her home situation, she would be expected to present to work on time as scheduled. Akilah expressed understanding.

(Doc. 51-5 ¶ 28; Doc. 51-7 p. 66).

When Hatfield became upset with patients or staff, she would use profanities to or in the presence of the staff.  (Doc. 51-9 ¶¶ 10-11).  In her deposition, Hatfield testified that she regularly used profanity ("Shit[,] Ass[,]" "the F word" and "GD") at work and elsewhere, and that she "probably will again."  (Doc. 51-2 p. 29).  She stated that "it is not like I'm broadcasting it to the patients.  It's to myself or to one of my other coworkers." (Doc. 51-2 p. 29).  At some point, Joseph counseled Hatfield for using profanities in front of staff and also for wearing her iPod at work, but she did not give her a written correction form for those behaviors. (Doc. 51-5 ¶ 29).  Hatfield stopped listening to her iPod during her shift after she was told not to use it at work.  (Doc. 51-2 p. 29).

On July 15, 2009, Hatfield received another written performance evaluation.  (Doc. 1-2 pp. 27-28).  The evaluator's marks on the evaluation form indicate that Hatfield met or exceeded expectations in all areas subject to review except for attendance/punctuality.  (Doc. 1-2 pp. 27-28).  The evaluator provided the following comments:

> This is Akilah's first year in dialysis.  She is a fast learner and is eager to learn new tasks. Her knowledge and confidence is increasing as to be expected with more time and experience.  Akilah is also noted to be taking more initiative in certain areas as well. Akilah has struggled with tardiness for which she has been disciplined. She continues to learn policy and procedures in order to be a more effective team leader. Akilah is encouraged to work towards effective communication with co-workers as well as build better professional relations. Akilah is also encouraged to continue to work on mastering timeliness, as all of these things will help with time management (which continues to improve as well). Akilah is a compassionate person and this is greatly appreciated as is all of your efforts and hard work.

(Doc. 1-2 pp. 27-28).

However, Hatfield continued to be tardy.  (Doc. 51-5 ¶ 34).  From June 1, 2009 until

August 24, 2009, Hatfield was late to work an additional 38 times.  (Doc. 51-5 ¶ 34).

On August 12-13, 2009, BMAA's Regional Quality Manager, Cathy Drummond,

conducted an internal audit at BMAA's Opelika facility.  (Doc. 51-5 ¶ 31; Doc. 51-8 ¶ 6).

During the audit, one of Hatfield's machines was malfunctioning and Hatfield was behind

schedule initiating dialysis with that machine.  (Doc. 51-1 p. 52).  The Charge Nurse, Eric

Dowdell, continued to do his job of going through a checklist for approving the start of the

treatment while Hatfield was trying to finish preparing the machines.  (Doc. 51-1 p. 52).

Hatfield asked Dowdell for more time to finish her preparations, but Dowdell was "folding

his arms" and  "huffing and puffing and patting [his] feet" behind her.  (Doc. 51-1 p. 53, 55).

Dowdell told Hatfield:  "Look, you're not going to stop me from doing my job."  (Doc. 51-1

p. 53).  Hatfield felt "frazzled at that point with somebody huffing behind [her] and patting

[his] feet and [she] just felt like it was hostile," and she felt "badgered."  (Doc. 51-1 p. 53,

54).  Because she felt "frazzled," she made errors during the audit.  (Doc. 51-1 p. 53, 55).

The August 2009 internal audit revealed that Hatfield had not followed company

policies and procedures regarding patient prescriptions, had failed to document treatments

properly, and had failed to follow proper procedures for initiating and terminating patient

treatment.  (Doc. 51-5 ¶ 32).   The audit also revealed the other employees were not

following BMAA's procedures.  (Doc. 51-5 ¶ 31).  Following the audit, Joseph held a group

meeting with staff to discuss problems that the audit revealed.  (Doc. 51-5 ¶ 31).  Joseph also

31

individually counseled the employees who were working during the audit. (Doc. 51-5 ¶ 31).
The following employees received corrective action forms for mistakes that the audit
revealed: Debbie Glaze (a black, female PCT),[6] Brenda Levett (a black, female PCT),[7]
Dodge (a white, female RN);[8] and Hatfield.  (Doc. 51-5 ¶ 32).

    After reviewing the audit results, and in light of Hatfield's continued practice of
arriving late to work,[9] Joseph obtained approval from Sondra Jones (an African-American

_____

[6]On August 25, 2009, Glaze was given a written warning which stated:

Nature of incident:
Upon an internal audit performed on august 12- 13, 2009. staff was found not following
company policies and procedures with regards to patient prescriptions, failure to document
accordingly, proper wear of PPE, and improper hand sanitizing washing.

Describe expectation for change:
Staff is expected to fully comply with all company policies. procedures, and documentation
requirements. Staff is also advised to seek clarification in areas of uncertainty.

Consequences if No Change Occurs:
Failure to meet expectations for change described above or failure to demonstrate
satisfactory performance, will result in further corrective action, which may include
termination of your employment.

(Doc 51-7 p. 70).

    [7]On September 1, 2009, Levett was given a written warning that was identical to the one given to
Glaze on August 25, 2009.  (Doc 51-7 p. 72).

    [8]On August 25, 2009, Dodge was given a written warning that was identical to the one given to Glaze
that same day.  (Doc 51-7 p. 71).

    [9]Hatfield acknowledged a number of times in her deposition testimony that she "ha[d] excessive
tardiness."  For example:

Q: I mean, you were tardy on a regular basis, right?
Hatfield:  I have excessive tardiness.
Q: But it wasn't just once or twice during a month, I mean, you would be tardy five, six,
seven or more times during a month, wouldn't you?
Hatfield: Excessive tardiness, yes.
Q: Is that a yes?

female who was the Senior Employee Relations Manager in BMAA's human resources department) to place Hatfield on suspension for three days.  (Doc. 51-5 ¶ 34; Doc. 51-8 ¶ 6; Doc. 51-10 ¶¶ 1, 3).  At BMAA, suspension is the final level of progressive discipline before termination.  (Doc. 51-5 ¶ 34).  On August 24, 2009, Morris and Joseph met with Hatfield and provided her with written notice of suspension, which stated:

> Nature of Incident:
> Akilah received a final written warning in May 2009 for tardiness and the situation actually improved for a while; however, over the past few weeks the situation has become excessive again. Also upon an internal audit performed on [A]ugust 12- 13, 2009, Akilah was found not following company policies and procedures with regards to patient prescriptions, failure to document accordingly, proper wear of PPE, and improper procedure for initiating and terminating patient treatment. Auditor stated that when she attempted to provide Akilah with rationale for policies and procedures that Akilah walked away from her demonstrating insubordination.
>
> Describe Expectation for change:
> Because Akilah has been counseled recently and exhibits inconsistency with necessary improvement, she is being issued a three day suspension. Upon return Akilah is expected to fully comply with all company policies and procedures and to seek clarification in areas of uncertainty.
>
> Consequences if No Change Occurs:
> Failure to meet expectations for change described above or failure to demonstrate satisfactory performance, will result in further corrective action, which may include termination of your employment.

(Doc. 1-2 p. 32; Doc. 51-8 ¶ 6).

---

Hatfield: That's excessive tardiness.
Q: You had excessive tardiness is what you will say?
Hatfield: Yes.

(Doc. 51-2 p. 7).

Hatfield contends that she was not exhibiting insubordination when she walked away from the auditor.  (Doc. 51-1 p. 59).  Hatfield testified in her deposition that she and the auditor were standing "in the vicinity" of a patient whose treatment was finished, and she "walked away" from the auditor to tend to the patient.  (Doc. 51-1 p. 59).  Further, Hatfield testified in her deposition that, in the meeting with Joseph and Morris pertaining to her August 24, 2009 suspension, she reported that she felt intimidated, harassed, and discriminated against by Eric Dowdell when he huffed and puffed and patted his foot behind her during the audit.  (Doc. 51-1 p. 53).  She testified that she complained to Joseph and Morris that she "felt like if [she] had been white or male or whatever, [she] would have been treated differently."  (Doc. 51-1 p. 53).  She felt like she just uttered these complaints "to the wind, I never – nothing was followed up or anything like that."  (Doc. 51-1 p. 52).  However, Joseph stated in a sworn affidavit that Hatfield "never complained to [Joseph] that she was being discriminated on the basis of her race and/or gender. She also never complained that Charge Nurse Eric Dowdell discriminated against her on the basis of her race and/or gender." (Doc. 51-5 ¶ 42).  Morris also stated in a sworn affidavit that "Hatfield never made any complaints to [Morris] about race or gender discrimination. She also never made any complaints to [Morris] about BMAA employee Eric Dowdell, who served as both Team Leader and Charge Nurse before he became Clinic Manager at the Tuskegee Clinic."  (Doc. 51-8 p. 4).  Eric Dowdell also stated in a sworn affidavit:

> I never received any complaints from Ms. Hatfield of race or gender discrimination. She never indicated to me either that she thought she was being

34

bullied. She also never indicated to me that she thought that Deb Morris or Deirdre Joseph singled her out.

While I worked at the Opelika Clinic, I never encountered race discrimination in the workplace. I would never discriminate against any one on the basis of their race or gender.

(Doc. 51-9 ¶¶ 18-19).

Hatfield served her three-day suspension on August 24, 25, and 27, 2009. (Doc. 51-7 p. 32). On August 28, 2009, she returned to work at 7:54 a.m., although she was scheduled to start work at 6:45 a.m. that day. (Doc. 51-7 p. 32; Doc. 51-7 p. 54). On August 31, 2009, she was scheduled to start work at 6:45 a.m., but she arrived at work at 7:55 a.m. (Doc. 51-7 pp. 32-34; Doc. 51-7 pp. 54-55). On September 4, 2009 she was scheduled to start work at 6:45 a.m., but she arrived at work at 7:52 a.m. (Doc. 51-7 pp. 32-34; Doc. 51-7 pp. 54-55). Thus, after serving her suspension, on three out of eleven work days from August 28 through September 15, 2009, Hatfield reported to work more than one hour late.[10]  (Doc. 51-5 ¶ 34; Doc. 51-7 pp. 32-34; Doc. 51-7 pp. 54-55).

Meanwhile, by early September 2009, Joseph had received reports from several PCTs who worked on Hatfield's team, including Debbie Glaze and Brenda Levett, that Hatfield had instructed them to start dialysis before she had performed all the initial checks on the machines and the patients. (Doc. 51-5 ¶ 39; Doc. 51-7 p. 79; Doc. 51-8 ¶ 11).   Joseph

---

[10]Hatfield does not know why she "still [has] problems being tardy." (Doc. 51-1 p. 57). At her deposition, she testified: "I was supposed to be born in April, I was born in May, I don't know, it's just basically the start of my life. I have been fifteen minutes late with everything, my wedding. I will probably be late to my funeral." (Doc. 51-1 p. 57). Hatfield was more than fifteen minutes late to her deposition in this case; in fact, she was more than an hour late. (Doc. 51-1 pp. 3-4).

considered this to be a "major failure" to follow procedure because no PCT was allowed to initiate dialysis prior to an RN/Team Leader performing the necessary checks and assessments. (Doc. 51-5 ¶ 39).

In addition, a problem began to surface in September 2009 with respect to Hatfield's failure to follow the doctor's prescriptions in administering dialysis treatments. In prescribing dialysis treatments, doctors generally prescribe a certain amount of excess fluid to be filtered from the patient's blood in a four hour period. (Doc. 51-8 ¶ 7). If an RN/Team Leader decreases the patient's prescribed time for the removal of the prescribed amount of fluid from the patient, the machine pulls the fluid out of the patient faster and harder than it would if operating on the prescribed schedule. (Doc. 51-9 ¶ 16). Adjusting the rate of dialysis to a faster speed without a doctor's order may compromise patient safety and health because it can cause, among other things, a decrease in the patient's blood pressure (which could lead to seizures), cramping, and cardiac damage. (Doc. 51-5 ¶ 38; Doc. 51-8 ¶ 8). In her deposition, Hatfield testified as follows:

> Q: [M]aking sure that the patient is on [dialysis] for the right amount of time as prescribed by the doctor is important, correct?
>
> Hatfield: It is important.
>
> Q: Okay. It's dangerous if you do the dialysis process too quickly, for example, right?
>
> Hatfield: There are some effects that can take place if it's done too quickly, yes.
>
> Q: Because that speeds up the pace at which the machine draws the blood from

the patient, right?

Hatfield: Correct.

Q: Which could lead -- if it's going too fast, it could lead to a drop in blood pressure?

Hatfield: That can happen automatically without a fast blood flow rate or how fast you pull it off. That doesn't determine -- it can happen, but that's not to say that it won't happen in just a regular treatment according to the orders that are provided.

Q. I understand that. But when the doctor sets a scheduled time, how long the dialysis should take, that physician is making a judgment as to the medically correct amount of time the dialysis should take place?

Hatfield: Correct, yes.

Q. And deviating from that time increases risk of problems to the patient?

Hatfield: It could.

Q: Okay. But the doctor is in a better position to know that than you are, right?

Hatfield: Yes, I would say that.

Q: Which is why you have to follow the doctor's orders, right?

Hatfield: Correct.

(Doc. 51-1 p. 66).

However, documentation from September 2009 showed that Hatfield would sometimes program the dialysis machine to remove the prescribed amount of excess fluid in a shorter period of time than the doctor had ordered. (Doc. 51-8 ¶ 7). In other words, Hatfield was removing fluid too quickly from patients. (Doc. 51-8 ¶ 8). Hatfield did obtain

signatures on an "early termination of treatment form" from the patients whose dialysis she sped up in violation of doctors' orders. (Doc. 51-5 ¶ 38). However, she was still in violation of company policy when she adjusted the rate of dialysis contrary to the doctor's orders. (Doc. 51-5 ¶ 38). In her deposition, Hatfield admitted that she sometimes sped up the rate of dialysis to allow a patient to finish dialysis early, but she contended that she "never pulled off more [fluid] than what the doctors classified as excessive, from what [she] understood." (Doc. 51-1 pp. 68 -70; Doc. 51-2 pp. 1- 2). She testified that, in her orientation, Eric Dowdell trained her to adjust the dialysis rates in this manner. (Doc. 51-1 pp. 68 -70; Doc. 51-2 pp. 1- 2).

On September 1, 2009, Eric Dowdell closed out (or finished treatment) on a patient that Hatfield had put on dialysis. (Doc. 51-9 ¶ 13). Dowdell noticed that the ultrafiltration clock ("UF clock ") (which can be manipulated) on the dialysis machine had a significantly different time than the "Remaining Time to Dialyze" ("RTD") clock, which reflects the actual time left to dialyze. (Doc. 51-9 ¶ 13). In addition, the patient's weight after dialysis was less than the estimated dry weight (patient's expected weight after completing dialysis) even though the patient was taken off dialysis almost an hour before the doctor had prescribed him to be removed from dialysis. (Doc. 51-9 ¶ 13). This indicated to Dowdell that Hatfield had increased the rate of dialysis in violation of the doctor's prescription for the treatment. (Doc. 51-9 ¶ 13). The record contains documentation confirming that Hatfield sped up the rate of dialysis on September 1, 2009, reducing the total time to complete the

dialysis to three hours and twenty-three minutes from the prescribed four hours and fifteen minutes. (Doc. 51-7 p. 79).

On September 4, 2009, Eric Dowdell observed that Hatfield had again, in violation of the doctor's orders, changed the ultrafiltration clock on the dialysis machine, which changed the rate of the patient's dialysis in violation of the patient's prescription  (Doc. 51-9 ¶ 14; *see also* Doc 51-4 p. 16).  Dowdell reported to Joseph that Hatfield was adjusting the rate of dialysis in violation of the physicians' prescriptions.  (Doc. 51-5 ¶ 37; Doc. 51-9 ¶ 17).  Dowdell wrote the following memo to Joseph:

> On 9/4/09[,] [at approximately] 09[:]10[,] I observed [patient's] machine, [redacted], with less time on the UF clock than on the RTD clock.  I asked [patient] if he was getting off early from [treatment] and he said yes.  He had not yet reached his goal on the machine.  I did bring it to his nurse's attention, Akilah Hatfield, that [patient's] clocks on machine had differing times.  She stated that the clocks had different times to help pull off the patient's fluid before he left early.  I informed her that we can't do that because that is not [patient's] proper [treatment] prescription.  She stated she was not aware that we could not do that.  [Patient] requested that his treatment end at that time so he could go ahead and leave.
> Eric Dowdell, RN.

(Doc. 51-9 ¶ 17; Doc. 51-9 p. 13; *see also* Doc 51-4 p. 16).

As reflected in his memorandum to Joseph, on September 4, 2009, Eric Dowdell (who by this time was Hatfield's supervisor) did tell Hatfield that she could not adjust the time on the ultrafiltration clock.  (Doc. 51-9 ¶ 14).  In her deposition, Hatfield confirmed that, on September 4, 2009, Eric Dowdell told her "not to change the time on the dialysis machine. And when [she] asked him about it, you know, [she] never received any follow-up

clarification or anything like that." (Doc. 51-2 p. 6). In her EEOC intake documents, Hatfield wrote:

> September 3-September 4, 2009
>
> I was told not to change the ultrafiltration clock because it change the rate of ultrafiltration.
>
> I did not have a clear understanding and when I ask for a clarification I was ignored and I assume reported to the CM and Area Manager.
>
> I never received any reference # to the policy that was broken or how to correct the broken policy.

(Doc. 1-7 p. 11) (sic).

Nevertheless, on September 5, 2009, Hatfield again sped up the dialysis rate so that one patient's blood was filtered and cleaned, and the patient met his target dry weight, in only *one hour and fifty-one minutes*, even though the doctor's prescription specified that the treatment was to occur over a period of *four hours and fifteen minutes*. (Doc. 51-4 p. 17). According to Charge Nurse Eric Dowdell:

> It was evident that the rate of dialysis had been increased because the patient almost reached his estimated dry weight goal of 140 (his post dialysis weight was 140.60) about two and a half hours before his dialysis was scheduled to end.

(Doc. 51-9 ¶ 15).

Because of the seriousness of the reports Joseph received from Dowdell and the PCT's, she analyzed several of Hatfield's patient flow sheets (forms that the RN/Team Leader filled out to document treatment procedure) and discovered that Hatfield had

apparently administered Heparin without performing a proper analysis, that Hatfield had

falsified documentation regarding treatment (one of the patient flow sheets indicated an

impossibility: that Hatfield had administered Heparin before she even arrived at work[11]), and

that Hatfield had increased the rate of dialysis on several patients in violation of a doctor's

orders.  (Doc. 51-5 ¶ 37; Doc. 51-7 p. 54; Doc. 51-7 pp. 76-78; Doc. 51-8 ¶¶ 9-10).   In

addition, according to the documentation, "it would not be clear that [after administering

Heparin, Hatfield] had allowed proper time (about five minutes) for the patient to process the

Heparin before beginning dialysis treatment on the patient."  (Doc. 51-9 ¶ 8).

According to Joseph, Hatfield's misconduct jeopardized patient safety and was also

in clear violation of the clinic's procedures, state law, and the physician's orders.  (Doc. 51-5

¶ 40).   Therefore, Joseph consulted with Deb Morris and with Sondra Jones in BMAA's

Human Resources Department, and together they determined that Hatfield should be

terminated from employment for violating doctors' prescriptions, for "serious" violations

company policies and procedures, and because of continued tardiness.  (Doc. 51-5 ¶ 41; Doc.

51-8 ¶ 12; Doc. 51-10 ¶¶ 5-6).

On September 16, 2009, Hatfield was provided with the following written notice of

termination:

Nature of incident:
On 8/4/09 Akilah was suspended for three days for failing to follow policy and

---

[11]On August 22, 2009, Hatfield clocked in at work at 6:06 a.m.  (Doc. 51-7 p. 54).  Data entered in
her patients' flow sheets shows that, on August 22, 2009, she administered heparin to one patient at 6:05
a.m., a second patient at 6:07 a.m., and a third patient at 6:08 a.m.  (Doc. 51-7 pp. 76-78).

procedure. Upon her return, Akilah has continued to not follow policy and procedure with treatment initiation, documentation, and patient's prescription. Akilah also instructed her team members to not follow policy and procedure.

Describe Expectation for change:
Due to the severity and the lack of improvement and regard for company policies, Akilah is being terminated.

(Doc. 1-2 p. 40; *see* Doc. 51-8 ¶ 13; Doc. 51-10 ¶¶ 5-6).

When Morris and Joseph met with Hatfield on September 16, 2009  to provide her with the written notice of her termination, Hatfield did not ask any questions or deny violating BMAA's policies or procedures. (Doc. 51-8 ¶ 13).

On September 17, 2009, Hatfield called the Employee Access Response Line (BMAA's hotline for employees to place complaints).  (Doc. 51-10 ¶7; Doc. 51-10 pp. 8-9). Hatfield stated that she believed she was supposed to have received a 2.5% salary increase, but that her paychecks revealed only a 2.0% increase.  (Doc. 51-10 ¶7; Doc. 51-10 p. 9). Hatfield also stated during the hotline call that she was discharged on September 16, 2009 for violation of policy and procedures and that she violated the policy with regard to dialysis prescriptions.  (Doc. 51-10 ¶7; Doc. 51-10 p. 9).  She requested that someone investigate her termination because she felt she was never given the policy in writing or properly trained to follow the policy.  (Doc. 51-10 ¶7; Doc. 51-10 p. 9).  Sondra Jones  investigated Hatfield's hotline complaint. (Doc. 51-10 ¶8).  After investigating the complaint, Jones determined that the 2.0% salary increase was in accordance with Hatfield's evaluation rating, because the merit increase is based on points awarded in employee evaluations. (Doc. 51-10 ¶8; Doc. 51-

10 p. 9).  A 2.5% increase would have been the highest merit increase Hatfield could have received and would have required a higher evaluation rating than Hatfield actually obtained. (Doc. 51-10 ¶8; Doc. 51-10 p. 9).  Jones also determined that Hatfield had been "repeatedly" trained to follow physician prescriptions.  (Doc. 51-10 ¶8).

On September 20, 2009, Jones notified Hatfield via telephone of the results of her investigation.   (Doc. 51-10 ¶9; Doc. 51-10 p. 9).   Jones informed Hatfield that her evaluations only entitled her to a 2.0% raise, and that

> [Hatfield had] received training through her preceptor when hired as well as all other employees.  She has been spoken to on several occasions about altering a patient's prescriptions which is a violation unless you have orders from a MD.  Audits are also conducted on a regular basis by the [clinic manager] and the [area manager] to prevent and address any issues of this type.

(Doc. 51-10 p. 9).

In response to Jones's report, Hatfield thanked Jones and voiced no additional concerns.  (Doc. 51-10 ¶9; Doc. 51-10 p. 9).  Hatfield never made a complaint of race or gender discrimination to Jones or to the Employee Access Response Line.  (Doc. 51-10 ¶10; Doc. 51-10 pp. 9-10).

On October 29, 2009, Hatfield filed the following EEOC charge alleging race and gender discrimination and retaliation:

> I am a Black female. I was hired by [BMAA] in May 2008 as a registered nurse. I was the only female Black registered nurse employed at the facility. Throughout my employment history, I was subjected to harassment, intimidation by my supervisor as well as disparate terms and conditions of employment with respect to a hostile work environment because of these actions.  On May 29, 2009, I was given a final warning and suspended in

43

August 24, 2009. I complained to management on several occasions that I believed I was being treated in this manner because of my race. On September 16, 2009, I was terminated. White employees were not subjected to the treatment I received. A Black registered nurse who worked at the facility prior to me transferred to another location because of the treatment she received.

The reason give for my termination was violation of company policy according to Deirdre Joseph, Clinic Manager.

I believe I was discriminated against because of my race, Black, my sex, female and in retaliation for having complained of the discriminatory treatment I was receiving in violation of Title VII of the Civil Rights Act of 1964, as amended.

(Doc. 1-1 p. 2).

Attached to Hatfield's complaint in this case is BMAA's response to the EEOC's investigation of Hatfield's discrimination charge, in which BMAA stated:

### A.     Background on BMAA

BMAA operates dialysis clinics in Alabama. BMAA is an equal opportunity employer and prohibits unlawful discrimination, retaliation and harassment on the basis of race, sex or other protected traits. BMAA employees who believe they are the subject of unfair treatment or discrimination can submit their complaints for investigation and resolution by utilizing a grievance policy, an employee hotline, the human resources department or the regular chain of command. Copies of relevant policies from BMAA's employee handbook, which Hatfield received, are attached as Exhibit I.

### B.     Events Leading to Hatfield's Termination

Hatfield was employed as a Registered Nurse and Team Leader at BMAA's Opelika clinic. In that position, she was responsible for supervising 10 patient dialysis stations and the Patient Care Technicians who treated patients at those stations. Patients usually begin appearing at the clinic around 5:45a.m. and are then prepared for dialysis treatment. It was imperative that Hatfield report to work in a timely manner because the Patient Care Technicians who reported to Hatfield could not begin to dialyze patients without Hatfield reviewing the

patients, administering Heprin or other drugs, and approving the start of the dialysis process.

Unfortunately, Hatfield failed to report to work in a timely manner, failed to follow applicable procedures, and falsified documentation.

Hatfield's inability to report to work in a timely manner began shortly after she was hired in May 2008. In June 2008 Hatfield received a written warning because she missed three days of work and was chronically late or tardy. (See Exhibit 2) Although Hatfield's attendance improved for a while, less than a year later on May 29, 2009, BMAA issued her a final written warning because of her continued tardiness. (See Exhibit 3) Hatfield acknowledged her attendance problems and the disruption she had caused, but instead of correcting her tardiness, she wrote a memorandum to all clinic employees stating that she likely would be late again and requested that management change her schedule because of her inability to report to work in a timely manner (which could not be done because of patient schedules).

Only a few weeks later in August an internal audit found that, among many problems, Hatfield had not followed company policies and procedures regarding patient prescriptions, had failed to document properly, and had failed to follow proper procedure for initiating and terminating patient treatment. Hatfield also continued be tardy. When the auditor attempted to address the problems with Hatfield, Hatfield essentially ignored her and walked away. For these reasons, BMAA placed Hatfield on suspension, which is the final level of progressive discipline before termination. (See Exhibit 4)

Unfortunately, Hatfield's performance did not improve when she returned from he suspension.  Instead, she continued to report to work late and to violate important policies and procedures related to patient care. Among other things, Hatfield instructed Patient Care Technicians to initiate treatments before they were ready, administered Heprin without performing a proper analysis, falsified documentation regarding her treatment, and terminated a treatment before the prescribed treatment duration. Her misconduct not only violated important procedures, but also jeopardized patient safety.  Based on all of her performance issues and misconduct, BMAA terminated Hatfield's employment on September 16, 2009. (See Exhibit 5)

## C.      There is No Evidence of Discrimination

Hatfield's claim that she was terminated because of her race and sex, or in retaliation for complaining about discrimination, is wholly without merit. First, Hatfield did not complain to anyone at BMAA or Fresenius about discrimination or harassment. In fact, Hatfield did not mention race or sex discrimination, harassment or retaliation even when she contacted the Employee Access & Response hotline on the day after her termination to complain that she had not received a 2.5% pay increase (she was awarded 2%) and that she had not been trained on policies requiring she follow dialysis prescriptions (she had).  Needless to say, Hatfield cannot establish a prima facie claim of retaliation when she did not engage in any protected activity.

Second, all of the managers involved in the decision to termination Hatfield's employment are women, and the manager Hatfield identifies, Deirdre Joseph, is African-American. Thus, her claims of race and sex discrimination are questionable to say the least.

Third, Hatfield has not offered any evidence of discriminatory treatment. It is not enough to simply state that other employees were treated differently. Hatfield must show that similarly situated employees- white or male RNs who engaged in similar misconduct- were treated differently by the same supervisors or managers. *See Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) (holding that comparators must be "similarly situated in all relevant respects").  BMAA is not aware of any such employees, and Hatfield has not identified any herself. That is fatal to her claims of discrimination and retaliation.

Finally, the fact is that Hatfield really left BMAA no choice but to terminate her employment. Her conduct not only violated serious policies and procedures, it impacted patient care.

### D.    Conclusion
The foregoing demonstrates that BMAA did not subject Ms. Hatfield to unlawful discrimination or retaliation. Accordingly, BMAA respectfully requests that the Commission promptly issue a "no cause" determination in this matter and dismiss Ms. Hatfield's charge.

(Doc. 1-2 pp. 52-53) (Exhibits omitted).

On November 3, 2010, the EEOC mailed Hatfield a dismissal and notice of rights

letter.  (Doc. 1-2 p. 47).

On January 24, 2011, Hatfield filed a complaint in this court alleging that BMAA violated Title VII by subjecting her to discrimination and a hostile work environment on the basis of race and gender and by terminating her employment in retaliation for complaining about discriminatory practices.  Hatfield also alleged that BMAA committed libel and slander.[12]  Attached to Hatfield's complaint are her EEOC documents as well as documents showing that she was cited for "excessive tardiness and call-ins" at another place of employment before she worked at BMAA.  (Doc. 1-2 pp. 44, 46).

On December 12, 2011, BMAA filed a motion for summary judgment.  (Doc. 49).  On January 9, 2009, with leave of court to file her response after the submission deadline set

---

[12]In addition, Hatfield also alleges in her complaint: "I believe that because of the line of write-ups that I received and my known religious/spiritual stand I was terminated because of the fear of me signing a union petition in addition to" BMAA's other reasons for terminating her employment.  (Doc. 1-7 p. 13).  Hatfield has dropped any claim of discrimination on the basis of religion, and the record contains no evidence to support a religious discrimination claim.  (*See* Doc. 51-2 p. 25).  In her summary judgment submissions, Hatfield also alleges that the fear that she might have taken an interest in joining a union "may have been a contributing factor for [her] termination."  (Doc. 53 p. 11).  It does not reasonably appear from the complaint that Hatfield attempts to seek any relief under the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158, or that this court has original jurisdiction over any such claim. The record contains no evidence that could conceivably support an NLRA claim. Further, the court notes that any claim that a fear of union affiliation "was a contributing factor" to Hatfield's termination "in addition to" the other reasons for her termination would be frivolous.  An employee cannot prevail on an anti-union discrimination claim where the employer proves that it "would have reached the same decision even if, hypothetically, it had not been motivated by a desire to punish plaintiff for exercising his [union affiliation] rights."  *NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 401-403 (1983), *overruled on other grounds*, 114 S. Ct. 2251 (1994) (citing *Mt. Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977)).  In this case, BMAA has produced overwhelming, undisputed evidence that it terminated Hatfield for legitimate reasons (*e.g.*, tardiness, violations of policies and procedures, endangering patient safety) unrelated to any alleged "fear" that Hatfield might take an interest in joining a union.  There can be no question that BMAA would have terminated Hatfield's employment regardless of any perceived inclination on her part to entertain thoughts of joining a union. Therefore, Hatfield could not prevail on a claim that anti-union discrimination was a reason for her termination "in addition to" BMAA's legitimate reasons for terminating her employment.  *See Transp. Mgmt. Corp.*, 462 U.S. at 401-403.

by the court, Hatfield filed a response to BMAA's motion for summary judgment. (Doc. 53; Doc. 56). On January 20, 2012, with leave of court, BMAA filed a reply brief in support of its summary judgment motion. (Doc. 59).

On January 4, 2012, without leave of court, Hatfield filed an additional brief in opposition to the motion for summary judgment. (Doc. 60). On January 25, 2012, BMAA filed a motion to strike Hatfield's additional brief. (Doc. 62). On May 26, 2012, Hatfield filed a motion for leave to file an additional reply, in which she reasserted earlier arguments, submitted evidence of her damages, and argued that BMAA violated the Employee Free Choice Act ("EFCA"), a legislative bill introduced in Congress in 2009 but (as of the date of this order) not enacted into law. (Doc. 64). On April 2, 2012, BMAA moved to strike Hatfield's May 26, 2012 motion for leave to file. (Doc. 65). On August 10, 2012, Hatfield filed a motion for leave to file under seal, in which she argued that BMAA committed Medicare fraud and violated the law by operating 25 dialysis stations instead of 20 dialysis stations. (Doc. 66). On August 20, 2012, BMAA moved to strike Hatfield's August 10, 2012 motion for leave to file under seal. (Doc. 68).

## Discussion

### I.     Title VII Race and Gender Discrimination Claims

### A.     Hatfield Cannot Establish a Prima Facie Case of Discrimination

"Title VII of the Civil Rights Act of 1964 provides that it is unlawful for an employer 'to discriminate against any individual with respect to his compensation, terms, conditions,

or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Holifield v. Reno*, 115 F.3d 1555, 1561 (11th Cir. 1997) (quoting 42 U.S.C. § 2000e-2(a)(1) (1988)). "Where direct evidence of discrimination is absent, a [Title VII] plaintiff establishes a circumstantial, prima facie case of racial discrimination based on disparate treatment by showing several things: '(1) [she] belongs to a [protected class]; (2) [she] was subjected to adverse job action; (3) [her] employer treated similarly situated employees outside [her] classification more favorably; and (4) [she] was qualified to do the job.'" *Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1316 (11th Cir. 2003) (quoting *Holifield v. Reno*, 115 F.3d 1555, 1561-62 (11th Cir. 1997)); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 (1973).

In is undisputed that, as an African-American female, Hatfield is protected from race and gender discrimination under Title VII. *See Holifield, supra*. On summary judgment, Hatfield alleges that she was subjected to the following adverse employment actions[13]: (1) BMAA did not provide her with a name badge (Doc. 53 pp. 1-2, 4), and (2) she was subjected to disciplinary actions by BMAA (Doc. 53 pp. 5-6).

With respect to BMAA's alleged failure to provide her a name badge, Hatfield argues:

> Even if I had a desire to advance in this company, the behavior of [BMAA]
> was restricting and even excluding.  I do realize now that if I could not receive

---

[13]In light of Hatfield's *pro se* status, the court has liberally deciphered and construed Hatfield's complaint and summary judgment arguments. *See Powell v. Lennon*, 914 F.2d 1459, 1463 (11th Cir.1990) ("In the case of a pro se action, . . . the court should construe the complaint more liberally than it would formal pleadings drafted by lawyers."). *Cf. Timson v. Sampson*, 518 F.3d 870, 874 (11th Cir. 2008) (holding that *pro se* appellate briefs and the arguments contained in them are to be liberally construed).

a name badge, a promotion was never a possibility. . . .

. . . . I was never provided a name badge during my entire length of employment. The name badge is a distinguishing part of the uniform supplied by the Defendant. The only item of the uniform that differentiates the nurse from the patient care technician is a name badge that states name and position. Because everyone wears the same styles of the provided uniforms especially in the clinical setting, I believe this action is the equivalent of being appointed to judgeship and never receiving a black robe, the black robe is the biggest part of the uniform that set the Judge a part from everyone else that is dressed in casual attire in a courtroom setting.

Without avail it was brought to the Clinical Manager attention on two separate occasions that I had not received a name badge.

(Doc. 53 pp. 1, 4-5) (sic).

BMAA's alleged failure to provide Hatfield with a name badge is not an "adverse employment action" as that term is used in discrimination cases. "[T]o prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show *a serious and material change in the terms, conditions, or privileges of employment*. Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1215 (11th Cir. 2008) (emphasis in original) (quoting *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239-40 (11th Cir.2001). Hatfield's unsupported, subjective arguments to the contrary, the record contains no evidence that advancement at BMAA was contingent on an employee having or displaying a name badge. Further, the record contains no evidence that Hatfield ever sought a promotion and or that she was ever denied a promotion at BMAA

50

because she did not have a name badge (or for any other reason).  In fact, in May 2009, Hatfield stated in a letter to BMAA: "I do not wish or desire to advance to any position in this company.  My God given assignment is to administer dialysis through Team Leader/Direct Patient Care only." (Doc. 1-2 pp. 23-25).   The record also contains no evidence that the absence of a name badge ever caused any confusion at BMAA as to whether Hatfield was an RN/Team Leader, or that any such confusion was pervasive or extensive enough to "seriously and materially" alter the conditions of Hatfield's employment. *See Butler*, *supra*.  Therefore, Hatfield cannot succeed on her Title VII claim on the basis of her allegation that she did not receive a name badge.  *See Butler* (holding that a Title VII claimant must prove that she suffered an "adverse employement action").

Hatfield also argues that she was subjected to discrimination because she was assigned to work at five unlicensed dialysis stations with allegedly malfunctioning machinery on the first day of the August 2009 audit.  (Doc. 53 p. 7).  Hatfield has not submitted evidence to support the allegation that she was the RN/Team Leader assigned to the five extra stations on August 12, 2009.   *See State Farm Fire & Cas. Co. v. Lacks*, 840 F. Supp. 2d 1292, 1297 (M.D. Ala. 2012) ("[A]rguments in briefs are not evidence. *See Vega v. Invsco Group*, Ltd., 432 Fed. Appx. 867, 872 (11th Cir.2011).").  Hatfield also has submitted no evidence to support a finding that the assignment to the extra stations constitutes an "adverse employment action."  Moreover, Hatfield has not cited any evidence to support a finding that she was treated differently than a non-minority employee in this regard.  *See Knight*, 330

F.3d at 1316(3) (holding that a Title VII plaintiff must prove that she was treated less favorably than "similarly situated employees outside [her] classification'").  The court notes that the August 2009 audit took place over a two-day period and that Hatfield alleges that she was the only black female RN/Team Leader.  Therefore, the RN assigned to the extra stations on the second day of the audit would have been male and/or a different race than Hatfield.  Moreover, the RN/Team Leaders each took responsibility for *half* of the dialysis stations; thus, the record does not support a finding that Hatfield was assigned more stations than any other RN/Team Leader on the first day of the audit.  (Doc. 51-5 ¶ 5;  Doc. 51-9 ¶ 5;  Doc. 51-1 pp. 16-17).  Accordingly, the evidence does not support Hatfield's prima facie case of race and gender discrimination with respect to her alleged assignment to extra stations on the first day of the August 2009 audit.

There is no dispute in this case, and the parties agree, that BMAA subjected Hatfield to adverse employment actions in the form of disciplinary actions and termination.  However, the record does not support Hatfield's arguments that she was treated less favorably than male employees or employees of other races with respect to discipline or her termination.  *See Knight*, 330 F.3d at 1316(3) (holding that a Title VII plaintiff must prove that "[her] employer treated similarly situated employees outside [her] classification more favorably'").  "To make a comparison of the plaintiff's treatment to that of non-minority employees, the plaintiff must show that he and the employees are similarly situated in all relevant respects."  *Holifield*, 115 F.3d at 1562.  To determine "whether employees are similarly situated . . . it

is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Id*.

For a comparator with respect to employee discipline, Hatfield points to Hermine Dodge, a white female RN/Team Leader, who was given a "written" disciplinary warning for violations that occurred during the August 2008 audit. (Doc. 53-1 p. 49). Hatfield was given a "verbal" warning for the same August 2008 audit. (Doc. 53-1 p. 51). Hatfield argues that differential treatment occurred when, approximately one year later, Hermine Dodge was given a "written" warning for violations that occurred during the August 2009 audit, but Hatfield was suspended for the same audit violations. (Doc. 53-1 p. 50). However, unlike Dodge, Hatfield had also received other disciplinary citations: she received a "written warning" for chronic tardiness in June 2008, and (in the time between the audit violation citations) she received a "final written" warning for tardiness in May 2009. (Doc. 53-1 pp. 52-53). Hatfield was also given a written performance evaluation in August 2008 in which she was marked down for tardiness and on which the evaluator indicated BMAA that Hatfield's recent improvements in timeliness were expected to continue (they did not).[14] (Doc. 51-5 ¶ 23; Doc. 51-11 p. 1). Further, unlike Dodge's August 2009 written warning, Hatfield's August 2009 suspension was not *just* for the audit violations. (Doc. 53-1 p. 54). Hatfield's written notice of suspension stated that, in addition to audit violations, the suspension was based on the fact that, despite Hatfield's May 2009 "final written" warning

---

[14] In addition, Hatfield was also given a verbal warning in August 2008 regarding the same audit violations for which Dodge was cited (Doc. 51-4 p. 3).

for tardiness, "the [tardiness] situation has become excessive again."  (Doc. 53-1 p. 54).
Between the May 29, 2009 "final written" warning for tardiness and the August 24, 2009,
suspension, Hatfield was late to work 38 times.  (Doc. 51-5 ¶ 34).

Therefore, because of Hatfield's intervening disciplinary warnings, Hatfield and
Dodge were *not* similarly situated in all relevant respects at the time they were given
disciplinary citations following the August 2009 audit.  Further, with respect to tardiness, the
two were not even "involved in or accused of the same or similar conduct."  *See Holifield*,
115 F.3d at 1562.  Therefore, Hatfield's superficial comparison between Dodge's August
2009 citation for a discrete incident of audit violations and her own August 2009 suspension
for audit violations *and* tardiness will not suffice for purposes of a Title VII claim. *Cf. Knight
v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1317 (11th Cir. 2003) ("Both Arnold and
Knight have documented histories of problems with coworkers. . . .  Had Knight's
[suspension] been based solely on her behavioral problems, Arnold might have been similarly
situated. But Knight's [suspension] was based on a review of her entire record, including her
performance and tardiness issues.").

Hatfield also argues that Hermine Dodge did not properly administer sodium dialysis
to patients, but was not terminated for failing to follow policy and procedure.  (Doc. 51-5 ¶
14).  During her orientation, Hatfield reported to Joseph that Dodge, an RN who has worked
at the Opelika Clinic for many years, was administering sodium dialysis to patients in
accordance with one of BMAA's older procedures instead of a newly revised procedure.

54

(Doc. 51-5 ¶ 14). Joseph counseled Dodge that she should administer sodium dialysis to patients per the newly revised procedure. (Doc. 51-5 ¶ 14). To Joseph's knowledge, Dodge has not used the old procedure again. (Doc. 51-5 ¶ 14). Hatfield alleges that Dodge continued to use the old procedure; however, Hatfield never again reported to anyone that Dodge was continuing to use the old procedure. (Doc. 51-1 p. 47). Hatfield has cited no evidence that, in using the old procedure, Dodge was engaged in a policy violation that was as serious as Hatfield's policy violations (at least some of which endangered patient safety). Moreover, Hatfield has cited no evidence that anyone other than herself even knew that Dodge continued to use the old procedure after she was instructed to use the new procedure. Accordingly, Hatfield has not shown that she and Dodge committed similar policy procedural violations. *See Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001) ("To satisfy the similar offenses prong, the comparator's misconduct must be nearly identical to the plaintiff's in order to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges.").

Hatfield also argues that Travis Leprettre, a white male RN who began training in May of 2009, was not formally disciplined for audit violations in August 2009, even though she alleges that he was present at BMAA at least one day of two-day the audit. (Doc. 51-5 ¶ 13; Doc. 51-6 pp. 63-67). Leprette received only "individual counseling" from Joseph in conjunction with violations detected during his first audit in August 2009. (Doc. 51-5 p. 9). Hatfield, who began training in May 2008, was given a formal "verbal" warning for audit

violations following her first audit in August 2008.  (Doc. 51-5 ¶ 6; *see also* Doc. 1-1 p. 2).

Unlike Leprettre, however, at the time Hatfield received her first ("verbal") citation for audit

violations in August 2008, *she had already received* formal written disciplinary action for

previous misconduct and she had been chronically and excessively tardy.  (*See* Doc. 53-1 p.

52).  In addition, Hatfield was present throughout the entire audit on August 27, 2008, but

Leprette did not work on August 13, 2009, the second day of the two-day August 2009 audit.

(Doc. 51-7 pp. 7, 31).   Accordingly, the court concludes that Hatfield and Leprette are not

similarly situated and their misconduct is not "nearly identical" for purposes of comparing

whether they were disciplined in different ways.  *See Silvera v. Orange County Sch. Bd.*, 244

F.3d 1253, 1259 (11th Cir. 2001) (holding that "the comparator's misconduct must be nearly

identical to the plaintiff's in order to prevent courts from second-guessing employers'

reasonable decisions and confusing apples with oranges").

Accordingly, Hatfield cannot establish a prima facie case of discrimination, and

BMAA is entitled to summary judgment on her Title VII discrimination claims.  *See*

*Holifield*, 115 F.3d at 1562 ("*If a plaintiff fails to show the existence of a similarly situated*

*employee, summary judgment is appropriate where no other evidence of discrimination is*

*present.*" (emphasis in original)).

**B.    Hatfield Cannot Overcome BMAA's Showing of A Legitimate Basis for Adverse**
**        Employment Actions**

Alternatively, Hatfield's Title VII discrimination claims fail as a matter of law

because the record contains no evidence to contradict BMAA's showing of a legitimate,

56

nondiscriminatory basis for subjecting Hatfield to adverse employment actions in the form of disciplinary actions and termination of employment.  Specifically, the record is replete with uncontradicted evidence that supports BMAA's assertion that Hatfield was disciplined, and her employment was terminated, on the nondiscriminatory basis of chronic and excessive tardiness, violations of BMAA' policy and procedure, failure to follow doctors' prescriptions, and endangering patient safety.

Hatfield admits that she was "excessively tardy," and she does not even attempt to argue that the disciplinary actions she received for tardiness were pretextual.  (Doc. 51-1 p. 29, 36-37, 45, 57-58; Doc. 51-2 p. 7; Doc. 1-2 pp. 21-25; Doc. 51-7 p. 66).  BMAA undisputedly had a legitimate basis to discipline Hatfield for the nondiscriminatory reason that she was tardy.  *Cf. Butler*, 536 F.3d at 1216 ("[T]he work day started at 7:00 a.m., so requiring [the plaintiff] to be present for work at that time was also not an adverse employment action.").

Hatfield also argues that she "did not receive clarification, re-education and or training from the charge nurse and or clinical manager concerning any of the violations claimed by the Defendant outside of the attendance policy."  (Doc. 53).  Again, the arguments in Hatfield's brief "are not evidence."  *Lacks*, 840 F. Supp. 2d at 1297.  Further, the record is replete with evidence and admissions by Hatfield herself that she *was* on notice that she was required to follow BMAA policy and procedures and physician prescriptions, and she *was* given explanations as to audit violations. (*See*, *e.g.*, Doc. 53-1 p. 65; Doc. 1-2 p. 36-38; Doc.

53-1 p. 8 (Hatfield's admission that "Cathy Drummond was able to state rationale for policies and procedures" Hatfield violated during the August 2009 audit and Hatfield verbally acknowledged understanding); Doc. 51-9 ¶ 4; Doc. 51-1 pp. 17, 33.).  Moreover, Hatfield points to no provision in Title VII or any other law that requires an employer to provide documentation or retraining after an employee violates the employer's policies and procedures.  Finally, if anything, Hatfield's allegation that she was not re-trained on policies and procedures *after she violated them* is an implicit admission that *she did violate BMAA's policies and procedures*, thus supporting BMAA's showing that it had a legitimate reason to take disciplinary measures.  In sum, the undisputed evidence establishes that BMAA had a legitimate, nondiscriminatory basis to discipline Hatfield for violating BMAA's policies and procedures.

Hatfield argues that Eric Dowdell trained her *not* to follow physician prescriptions with respect to the rate of dialysis or the amount of time for administering dialysis. (Doc. 53; *see also* Doc. 51-1 pp. 68 -70; Doc. 51-2 pp. 1- 2 (Hatfield's deposition testimony that she was trained to alter doctors' prescriptions)).  However, it is undisputed that, in early September 2009, BMAA first discovered Hatfield's failures to follow doctors' prescriptions by changing the dialysis clock and changing the rate of dialysis to speed up the treatment. (Doc. 51-8; Doc. 51-7; Doc. 51-9; Doc 51-4 p. 16; Doc. 51-5 ¶ 37; Doc. 51-9 ¶ 17). Therefore, the only disciplinary action that could have been premised on these violations was the only one that occurred in September 2009, *i.e.*, Hatfield's termination.  It is also

undisputed that, on September 4, 2009, Eric Dowdell told Hatfield that she was *not allowed* to alter prescriptions by changing the dialysis clocks and speeding up the dialysis treatments. (Doc. 51-9 ¶ 17; Doc. 51-9 ¶ 13-14; Doc 51-4 p. 16; Doc. 51-2 p. 6; Doc. 1-7 p. 11).

Nevertheless, on September 5, 2009, in violation of Dowdell's direct instructions, Hatfield again sped up the dialysis rate so that one patient's blood was filtered and cleaned, and the patient met his target dry weight, in only one hour and fifty-one minutes, even though the doctor's prescription specified that the treatment was to occur over a period of four hours and fifteen minutes.  (Doc. 51-4 p. 17; Doc. 51-9 ¶ 15).   There is no question that Hatfield knew that speeding up the dialysis process endangered patient safety  (Doc. 51-1 pp. 32, 66). Thus, there can be no question that, at the time Hatfield's employment was terminated, she had changed the filtration clock and sped up dialysis *even though her supervisor had expressly instructed her not to, and even though she knew it posed a risk to patient safety*. In fact, in her summary judgment response, Hatfield states:

> The purpose of dialysis is to filter toxins out of the blood and remove fluid from the body's circulatory system, therefore doing what the kidneys can no longer do for the body. Each patient has a prescribed dialysis time, and filtering and fluid removal is factored into this prescribed time. It is very important that the patient stay the entire treatment to receive full removal of toxins and fluid from the body.

(Doc. 53 p. 4).

In other words, the undisputed evidence and Hatfield's own admissions establish that BMAA had a legitimate basis to take disciplinary action and terminate Hatfield's employment for the nondiscriminatory reason that she was failing to follow physicians'

prescriptions and endangering patient safety.  Therefore, BMAA is entitled to summary judgment on Hatfield's discrimination claim.  *Cf.*, *e.g.*, *Wascura v. City of S. Miami*, 257 F.3d 1238, 1247 (11th Cir.2001) ("In light of the ample legitimate reasons for the termination decision proffered by the[employer], the truth of which was never effectively challenged, and in light of the fact that [the employee] adduced virtually no evidence of discrimination, we cannot conclude that a reasonable jury could find for the [employee] based merely on . . . temporal proximity" and a "very weak inference" of a discriminatory motive).

## II.    Hostile work environment

Title VII prohibits discrimination with respect to an employee's "terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a)(1). It is well established that the statutory phrase "terms, conditions, or privileges of employment" includes within its scope harassment that results in a discriminatorily hostile or abusive work environment. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). "A hostile work environment claim under Title VII is established upon proof that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir.2002).

To prevail on a hostile work environment claim, a plaintiff must establish that: (1) "he belongs to a protected group;" (2) "he has been subject to unwelcome harassment;" (3) "the harassment [was] based on a protected characteristic of the employee;" (4) "the harassment

was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment;" and (5) "the employer is responsible for such environment under either a theory of vicarious or direct liability." *Miller*, 277 F.3d at 1275. The fourth element of the hostile work environment test contains both a subjective and an objective component. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir.1999) (en banc).

To satisfy the fourth element, the employee must "subjectively perceive" the harassment as severe and pervasive enough to change the terms or conditions of employment, and the district court must find that this perception was objectively reasonable. *Id.* In making this objective determination, the following factors should be considered: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Id.* "[C]onduct must be extreme to amount to a change in the terms and conditions of employment;" "simple teasing, offhand comments, and isolated incidents" will not suffice. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citations and internal quotation marks omitted). "These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" *Id.*

In her complaint, Hatfield alleges that she was subjected to harassment and a hostile work environment on August 12, 2009, when Eric Dowdell allegedly subjected her to "verbal

61

and nonverbal intimidation, threatening actions, and belittling comments."  (Doc. 1-2 p. 30).

On August 12, 2009, during an audit, one of Hatfield's machines was malfunctioning and

Hatfield was behind schedule initiating dialysis with that machine.  (Doc. 51-1 p. 52).  While

Hatfield was trying to finish preparing the machines for the procedure, Dowdell was going

through his checklist for approving the start of the treatment.  (Doc. 51-1 p. 52).  Hatfield

asked Dowdell for more time to finish her preparations, but Dowdell was "fold[ed] his arms"

and began "huffing and puffing and patting [his] feet" behind Hatfield.  (Doc. 51-1 p. 53,

55).  Dowdell also told Hatfield:  "Look, you're not going to stop me from doing my job."

(Doc. 51-1 p. 53).  Hatfield felt "frazzled at that point with somebody huffing behind [her]

and patting [his] feet.  (Doc. 51-1 p. 53, 54).  She "just felt like it was hostile," and she felt

"badgered."  (Doc. 51-1 p. 53, 54).

 One incident of "huffing and puffing and patting . . . feet," "folding . . . arms," and

causing Hatfield to feel "badgered" and "frazzled" cannot form the basis of a hostile work

environment claim.  An "isolated incident" does not constitute a sufficiently frequent and

pervasive discriminatory change in the terms and conditions of Hatfield's employment

harassment to create an abusive working environment.  *Faragher*, 524 U.S. at 788; *Miller*,

277 F.3d at 1275.  Further, the record contains absolutely no evidence to support a finding

that Dowdell's alleged rudeness was in any way based on Hatfield's race or gender; rather,

the only evidence in the record regarding this incident demonstrates that Dowdell's behavior

was motivated by delays in initiating the dialysis process.  (Doc. 51-1 pp. 52-53).  *See Miller*,

277 F.3d at 1275 (holding that Title VII hostile work environment claims only bars harassment that is "based on a protected characteristic of the employee").   Even *if* Dowdell was behaving rudely during this particular incident, Title VII is not a general civility code, and the incident cannot support a hostile work environment claim.  *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998).

Hatfield also alleges in her complaint that Dowdell harassed her by "reporting her to the C[linic] M[anager]," Dierdre Joseph.  (Doc. 1-2 p. 29).  However, Hatfield has not submitted any evidence to contradict BMAA's showing that Dowdell made a substantiated report to Joseph not on the basis of race or gender, but because she was changing the ultrafiltration clock on the dialysis machine and speeding up patients' treatment in violation of her duty to administer dialysis according to prescription.  (Doc. 51-9 ¶ 17; Doc. 51-9 p. 13; *see also* Doc 51-4 p. 16).  Thus, the record contains no evidence that Dowdell ever made any unfounded or discriminatory reports to Joseph about Hatfield.  Because Dowdell's report to Joseph was *not* based on Hatfield's race or gender, but on her failure to follow BMAA policy and physician prescriptions, his report cannot support a hostile work environment claim under Title VII.  *See Miller*, 277 F.3d at 1275 (holding that, to support a hostile work environment claim, harassing conduct must be "based on a protected characteristic of the employee").

**III.   Retaliation Claim**

In her complaint, Hatfield alleges that she reported to Joseph that Dowdell

63

discriminated against her and harassed her on August 12, 2009.  (Doc. 1-2 p. 29-30).

Hatfield alleges that she told Joseph that she "believe[d] [Dowdell's conduct] was

discrimination [based] on the fact that [Hatfield] was the only black female team leader on

the unit" and "because [she] look[ed] diff[e]rent . . . [she] was singled out." (Doc. 1-2 p. 30).

Hatfield also alleges that she told Joseph that she "was singled out and . . . that [she] believed

that no one else would have been subjected to such treatment."  (Doc. 1-2 p. 30).  Hatfield

alleges that her August 24, 2009 suspension and her subsequent termination were the result

of retaliation for reporting to Joseph that she felt Dowdell had harassed her and discriminated

against her.

To avoid summary judgment on a Title VII retaliation claim, a plaintiff must establish

a prima facie case of retaliation by showing: (1) that the plaintiff engaged in statutorily

protected conduct; (2) that the plaintiff suffered an adverse employment action; and (3) that

the adverse action was causally related to the protected expression. *McCann v. Tillman*, 526

F.3d 1370, 1375 (11th Cir. 2008).  "A 'close temporal proximity' between the protected

expression and an adverse action is sufficient circumstantial evidence of a causal connection

for purposes of a prima facie case." *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir.

2004).

BMAA does not dispute that Hatfield was subject to adverse employment actions

when she was suspended and when her employment was terminated. Further, although

BMAA produced evidence that Hatfield never complained of discrimination or harassment

(Doc. 51-5 ¶ 42; Doc. 51-8 p. 4; Doc. 51-9 ¶¶ 18-19), Hatfield testified in her deposition that she did make such a complaint to Joseph.  (Doc. 51-1 p. 52).  Therefore, a genuine issue of material fact exists as to whether Hatfield engaged in statutorily protected expression.  *Cf. Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1188 (11th Cir. 2001). (holding that a plaintiff may proceed on a claim for retaliation for reporting discriminatory conduct, so long as the plaintiff had a good-faith reasonable belief[15] that she was the victim of such harassment).

Further, Hatfield allegedly made her complaint of discrimination on or after August 12, 2009.  Therefore, the statutorily protected expression would have occurred within weeks of Hatfield's suspension, and approximately one month before BMAA terminated her employment.  Accordingly, the record is sufficient establish a prima facie showing of "some causal connection" between Hatfield's engagement in statutorily protected expression and the subsequent adverse employment actions.  *See Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 601 (11th Cir.1986) ("The short period of time [ (one month) ] between the filing of the discrimination complaint and the . . . [adverse employment action] belies any assertion by the defendant that the plaintiff failed to prove [a prima facie case of] causation.").

"Once a plaintiff establishes a prima facie case of retaliation, the burden of production shifts to the defendant to rebut the presumption by articulating a legitimate,

---

[15]Because the Hatfield cannot rebut BMAA's showing that it had a legitimate, nondiscriminatory basis for terminating Hatfield's employment, the court will not address BMAA's argument that Hatfield lacked a good faith, reasonable belief that she had been subjected to discrimination.

non-discriminatory reason for the adverse employment action. If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted and drops from the case." *Brown v. Ala. Dep't of Transp.* 597 F.3d 1160, 1181 (11th Cir. 2010) (quoting *Bryant v. Jones*, 575 F.3d 1281, 1307-08 (11th Cir. 2009)). BMAA has presented extensive, uncontradicted evidence that Hatfield did engage in excessive tardiness, audit violations, violations of policy and procedure, failure to follow patient prescriptions, and endangering patient safety. *See*, *e.g.*, Doc. 1-2 pp. 32, 40; Doc. 51-1 p. 66, 68 -70; Doc. 51-2 pp. 1- 2, 7; Doc 51-4; Doc. 51-5; Doc. 51-7 pp. 32-34, 54-55; Doc. 51-8; Doc. 51-9; Doc. 51-10). BMAA has also presented evidence that Hatfield was suspended and fired for these reasons, and not for any reason related to Hatfield's race or gender. *See*, *e.g.*, *id*.

Once the employer rebuts the plaintiff's prima facie case by demonstrating a legitimate, nondiscriminatory reason for the adverse employment actions, the plaintiff "must then show that the employee's proffered reasons for taking the adverse action were actually a pretext for prohibited retaliatory conduct. In order to do so, [the plaintiff] must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *McCann*, 526 F.3d at 1375-76 (citations and internal quotation marks omitted). In this case, the record contains no evidence by which a reasonable factfinder could even question the validity BMAA's proffered legitimate reasons for suspending Hatfield and terminating her employment. BMAA's logical,

coherent, plausible, legitimate, nondiscriminatory reasons for its actions are supported by overwhelming, consistent, and uncontradicted evidence, including Hatfield's own admissions that she engaged in excessive tardiness and failed to follow BMAA's policies and procedures and physician prescriptions in administering dialysis. Accordingly, Hatfield's Title VII retaliation claim fails as a matter of law. *See McCann*, 526 F.3d at 1378 (holding that "[t]he district court properly granted summary judgment on the plaintiff's retaliation claims" because the plaintiff "failed to meet her burden to demonstrate that her employers' reasons for their actions as to overtime, performance rating and promotion were actually a pretext for retaliatory conduct").

## IV.   Defamation

Hatfield indicated in her deposition that her defamation claims were based on unspecified statements BMAA made about her in her termination write-up and in BMAA's position statement to the EEOC. (Doc. 51-2 p. 26). To establish a prima facie case of defamation, Hatfield must show: "(1) that [BMAA] was at least negligent (2) in publishing (3) a false and defamatory statement to another (4) concerning [Hatfield], (5) which is either actionable without having to prove special harm (actionable per se) or actionable upon allegations and proof of special harm (actionable per quod)." *See Federal Credit, Inc. v. Fuller*, 72 So. 3d 5, 11 (Ala. 2011) (citations and internal quotation marks omitted). "Truth is a complete and absolute defense to defamation." *Id*. (citations and internal quotation marks omitted).

Even when construing Hatfield's complaint liberally in light of her *pro se* status, *see Powell*, 914 F.2d at 1463, there is only one statement in either the termination write-up or BMAA's EEOC position that might possibly be in question with respect to Hatfield's defamation claim.  In BMAA's EEOC position statement, BMAA stated: "When the auditor attempted to address the problems with Hatfield [during the August 2009 audit], Hatfield essentially ignored her and walked away."  (Doc. 1-2 p. 52).  Hatfield contests the truth of this statement in her complaint and in her summary judgment submission.  (Doc. 53 pp. 9-10; *see also* Doc. 51-1 p. 58-60 (Hatfield's deposition testimony stating that she did "listen to what [the auditor] had to say")).  However, under Alabama law, pertinent statements made in the course of legal proceedings are absolutely privileged and cannot form the basis of a defamation claim.  *O'Barr v. Feist*, 292 Ala. 440, 445-46 (1974).  Accordingly, BMAA is entitled to judgment as a matter of law on Hatfield's defamation claim.

## V.   Other Pending Motions

On January 4, 2012, without leave of court, Hatfield filed an additional brief in opposition to the motion for summary judgment.  (Doc. 60).  In Hatfield's additional brief, she reasserted arguments made in her earlier summary judgment submissions.

On January 25, 2012, BMAA filed a motion to strike Hatfield's additional brief. (Doc. 62).  On May 26, 2012, Hatfield filed a motion for leave to file an additional reply, in which she reasserted earlier arguments, submitted evidence of her damages, and argued that BMAA violated the Employee Free Choice Act ("EFCA"), a legislative bill introduced in

Congress in 2009 but (as of the date of this order) not enacted into law.  (Doc. 64).  On April 2, 2012, BMAA moved to strike Hatfield's May 26, 2012 motion for leave to file.  (Doc. 65).  On August 10, 2012, Hatfield filed a motion for leave to file under seal, in which she argued that BMAA committed Medicare fraud and violated the law by operating 25 dialysis stations instead of 20 dialysis stations.  (Doc. 66).  On August 20, 2012, BMAA moved to strike Hatfield's August 10, 2012 motion for leave to file under seal.  (Doc. 68).

In preparing this recommendation, the court has considered all of the arguments and documents submitted by both parties, including those filed after the submission deadline in this case.  Therefore, the court will grant Hatfield's motion for leave to file (Doc. 64) and deny BMAA's motions to strike (Docs. 62, 65, & 68) as moot.

## CONCLUSION

Because the court concludes that there is no genuine issue of material fact and that BMAA is entitled to judgment as matter of law, it is the Recommendation of the Magistrate Judge that BMAA's motion for summary judgment (Doc. 49) be **GRANTED** and that this case be **DISMISSED** with prejudice.  It is further

**ORDERED** that Hatfield's motion for leave to file (Doc. 64) be and is hereby **GRANTED**.  It is further

**ORDERED** that BMAA's motions to strike (Docs. 62, 65, & 68) be and are hereby **DENIED** as moot.  It is further

**ORDERED** that the parties shall file any objections to this Recommendation on or

before **September 18, 2012**.  Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation objected to.  Frivolous, conclusive or general objections will not be considered by the District Court.  The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a de novo determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982).  *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982).  *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Done this 4th day of September, 2012.


                      /s/Charles S. Coody
                CHARLES S. COODY
                UNITED STATES MAGISTRATE JUDGE